DAIMLER–BENZ
AKTIENGESELLSCHAFT, Appellant,

v.

Scott OLSON, Individually and as Independent Executor of the Estate of Karen L. Olson, and Vickie Olson, Appellees.

No. 03–99–00114–CV.

Court of Appeals of Texas, Austin.

June 15, 2000.

Ruth G. Malinas, Ball & Weed, P.C., San Antonio, Bob E. Shannon, Baker & Botts, L.L.P., Austin, for appellant.

Richard P. Hogan, Hogan, Dubose & Townsend, L.L.P., Houston, Tommy Jacks,

Mark Einfalt, Mithoff & Jacks, L.L.P., Austin, for appellees.

Before Justices JONES, KIDD and B.A. SMITH.

BEA ANN SMITH, Justice.

The opinion and judgment issued herein on March 23, 2000 are withdrawn, and the following opinion is substituted in lieu of the earlier one.

In this appeal, we consider the contacts with Texas of a foreign parent corporation that designs and manufactures cars abroad, but has established a North American subsidiary to import and distribute those cars in the United States, including Texas. Appellant Daimler–Benz Aktiengesellschaft (Daimler–Benz) brings an interlocutory appeal from the district court's order overruling its objection to personal jurisdiction. *See* Tex.R. Civ. P. 120a. The suit from which this appeal arises is a products liability action brought against Daimler–Benz by appellees Scott Olson, the son of the decedent, Karen Olson, and executor of her estate, and Vickie Olson, Karen's daughter. We will affirm the district court's order.

**FACTUAL AND PROCEDURAL BACKGROUND**

Alleging that the Mercedes–Benz car Karen Olson was driving caught fire shortly after a van collided with it, causing Karen's death, the Olsons sued Daimler–Benz and the owner of the van, Central Produce Company of Temple, Texas. The accident occurred on April 3, 1995, in Temple, Texas. Scott and Vickie are Texas residents; the Mercedes–Benz Karen owned before her death was registered in Texas. The Olsons claimed that Daimler–Benz defectively designed and manufactured Karen's car, and that the defects caused her death. Daimler–Benz made a special appearance to challenge its amenability to suit in Texas. The district court overruled Daimler–Benz's objection, finding that jurisdiction over Daimler–Benz in Texas was proper.

Daimler–Benz is a German corporation with its principal place of business in Stuttgart, Germany. As shown in its annual reports, Daimler–Benz is a holding company with four corporate units: Mercedes–Benz, Daimler–Benz Industrie, Daimler–Benz Aerospace, and Daimler–Benz InterServices. These units, which comprehend all subsidiary corporations of Daimler–Benz, form the Daimler–Benz Group. The Mercedes–Benz corporate unit accounts for a preponderant share of Daimler–Benz's profit; in 1994, the Daimler–Benz Group earned profits of 0.9 billion deutsche marks, while the Mercedes–Benz unit returned 1.8 billion deutsche marks, its earnings being offset by losses in other corporate units.[1] The Mercedes–Benz unit contains both a passenger car division and a commercial vehicle division. In 1994, the Mercedes–Benz unit sold 592,400 passenger cars worldwide, 73,000 of these in the United States.

In 1995, the Daimler–Benz Group consisted of Daimler–Benz and its 319 domestic and foreign subsidiaries; in 1994, Daimler–Benz's subsidiaries numbered 357. Within the Mercedes–Benz corporate unit, subsidiaries apparently exist for every western European country, as well as for Brazil, Argentina, Nigeria, South Africa, Turkey, Iran, India, Japan, Indonesia, and Australia. In addition to establishing Mercedes–Benz of North America, Inc., Daimler–Benz has established Mercedes–Benz Canada, Inc., and Mercedes–Benz Mexico, S.A. de C.V.

Mercedes–Benz of North America, Inc. (MBNA) is the sole importer and distributor in the United States of Mercedes–Benz cars and parts. MBNA, a Delaware corporation with its principal place of business in Montvale, New Jersey, is a direct,

---

1. Daimler–Benz also reported its 1994 profits as 0.6 billion U.S. dollars. Using the same conversion rate, 1994 profits of the Mercedes– Benz unit would have been approximately $1.28 billion.

wholly owned subsidiary of Daimler–Benz North America Corporation (DBNAC). DBNAC, also a Delaware corporation but with its principal place of business in New York City, is a direct, wholly owned subsidiary of Daimler–Benz.[2]

## DISCUSSION

■ In two issues on appeal, Daimler–Benz contests the court's decision that Daimler–Benz is subject to the jurisdiction of Texas courts. A Texas court may exercise jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991); *see* Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (West 1997 & Supp.2000). The broad language of the long-arm statute permits an expansive reach, limited only by the federal constitutional requirements of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990). As a result, we consider only whether it is consistent with federal due process for Texas courts to assert personal jurisdiction over Daimler–Benz. *Guardian Royal*, 815 S.W.2d at 226.

■ The federal due process clause protects a person's liberty interest in not being subject to binding judgments of a forum with which that person has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 319,

66 S.Ct. 154, 90 L.Ed. 95 (1945)). Under the federal constitutional test of due process, a state may assert personal jurisdiction over a nonresident defendant only if the defendant has purposefully established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* at 476, 105 S.Ct. 2174. The ultimate test of minimum contacts is whether the defendant purposefully availed itself of the privilege of conducting activities in Texas, thereby invoking the benefit and protection of Texas laws. *Schlobohm*, 784 S.W.2d at 357–58. This requirement ensures that a nonresident defendant will be haled into court only as a result of its intentional activities, so that it is reasonable for the nonresident defendant to expect the call of a Texas court. *Guardian Royal*, 815 S.W.2d at 226; *Schlobohm*, 784 S.W.2d at 357–58.

■ The minimum contacts analysis has been refined into two types of jurisdiction—general and specific. Specific jurisdiction exists when the cause of action arises out of or relates to the nonresident defendant's contacts with the forum state. *Guardian Royal*, 815 S.W.2d at 230. The defendant's activities must have been purposefully directed toward the forum state. *Id.* at 228. Under specific jurisdiction, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Id.*

■ General jurisdiction exists when the defendant's contacts with the forum state are continuous and systematic, even

**2.** On July 1, 1989, Daimler–Benz transferred all of its motor vehicle business, as part of a business reorganization, to Mercedes–Benz Aktiengesellschaft. The transfer included all contractual rights and obligations relating to the automotive business, including distribution agreements. Mercedes–Benz Aktiengesellschaft was organized as a wholly owned subsidiary of Daimler–Benz, incorporated in Germany with its principal place of business in Stuttgart. On May 7, 1997, in a further business reorganization, Mercedes–Benz Aktiengesellschaft's rights and obligations were

transferred back to Daimler–Benz. Mercedes–Benz Aktiengesellschaft then ceased to exist. In our discussion of Daimler–Benz's corporate organization and activities, we will treat the automotive business as if Daimler–Benz had always retained it.

In 1998, Daimler–Benz and Chrysler Corporation entered into a business combination resulting in the creation of DaimlerChrysler AG. Because this event occurred beyond the time-frame relevant to this appeal, we do not consider it in our analysis.

if the cause of action does not arise from or relate to activities conducted within Texas. *Id.* For general jurisdiction, the minimum contacts analysis is more demanding, requiring a showing of substantial activities within the forum state. *Schlobohm,* 784 S.W.2d at 357.

The existence of personal jurisdiction is a question of law, but proper exercise of that jurisdiction must sometimes be preceded by the resolution of underlying factual disputes. We determine the appropriateness of the trial court's resolution of those disputes by an ordinary sufficiency of the evidence review based on the entire record. *Conner v. ContiCarriers & Terminals, Inc.,* 944 S.W.2d 405, 411 (Tex.App.—Houston [14th Dist.] 1997, no writ). If the trial court's order is based on undisputed or otherwise established facts, we conduct a de novo review of the order. *Id.* A defendant who challenges a court's exercise of personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985); *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex. 1982); *Nikolai v. Strate,* 922 S.W.2d 229, 236 (Tex.App.—Fort Worth 1996, writ denied); *Hayes v. Wissel,* 882 S.W.2d 97, 99 (Tex.App.—Fort Worth 1994, no writ).

When a trial court overrules a special appearance, the defendant should request findings of fact under Texas Rule of Civil Procedure 296. *Runnells v. Firestone,* 746 S.W.2d 845, 849 (Tex.App.— Houston [14th Dist.]), *writ denied per curiam,* 760 S.W.2d 240 (Tex.1988). Because the trial court made no findings in this case, all facts necessary to support its judgment are implied. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *In re W.E.R.,* 669 S.W.2d 716, 716–17 (Tex.1984); *Runnells,* 746 S.W.2d at 848. When a complete reporter's record exists, however, these implied findings are not conclusive and an appellant may challenge the sufficiency of the evidence to support them.

*Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989). When such points are raised, the standard of review to be applied is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Id.*

Thus, we will set aside a finding of the trial court only if the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Runnells,* 746 S.W.2d at 849. In reviewing such a point of error, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the finding should be set aside, regardless whether some evidence supports it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *King's Estate,* 244 S.W.2d at 661.

If evidence supports the implied findings of fact, we must uphold the trial court's judgment on any legal theory supported by the findings. *Worford,* 801 S.W.2d at 109; *Point Lookout West, Inc. v. Whorton,* 742 S.W.2d 277, 278 (Tex.1987); *Runnells,* 746 S.W.2d at 848. This is so regardless of whether the trial court articulates the correct legal reason for the judgment. *Harrington v. Railroad Comm'n,* 375 S.W.2d 892, 895 (Tex.1964); *Fish v. Tandy Corp.,* 948 S.W.2d 886, 891– 92 (Tex.App.—Fort Worth 1997, pet. denied); *Marifarms Oil & Gas, Inc. v. Westhoff,* 802 S.W.2d 123, 125 (Tex.App.—Fort Worth 1991, no writ). We review the legal conclusions supporting the judgment to determine whether they are correct as a matter of law. *Lawrence v. Kohl,* 853 S.W.2d 697, 699 (Tex.App.—Houston [1st Dist.] 1993, no writ).

## AFFIDAVITS

■ Before the pretrial hearing on Daimler–Benz's objection to jurisdiction, the Olsons filed two affidavits in support of jurisdiction—the affidavits of Susan Tarver and Mark Einfalt. Daimler–Benz filed written objections to these affidavits at the conclusion of the hearing. After considering the objections, the trial court overruled them. We review the trial court's evidentiary rulings on Tarver's and Einfalt's affidavits for an abuse of discretion. *St. Paul Fire & Marine Ins. Co. v. Confer,* 956 S.W.2d 825, 831 (Tex.App.—San Antonio 1997, pet. denied). An abuse of discretion occurs when a court acts without reference to guiding rules or principles, or acts arbitrarily or unreasonably. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985).

■ The Olsons argue that Tarver's affidavit qualifies as a record of regularly conducted activity and is admissible under the business record exception to the rule against hearsay. *See* Tex.R. Evid. 803(6). The foundation for the business record exception has four requirements: (i) the record was made and kept in the course of regularly conducted business activity; (ii) it was the regular practice of the business activity to make the record; (iii) the record was made at or near the time of the event that it records; and (iv) the record was made by, or from information transmitted by, a person with knowledge; the person with knowledge must have acted in the regular course of business, or as it is sometimes put, must have had a business duty to report. *See* Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, *Courtroom Handbook on Texas Evidence,* Authors' Commentary 407–08 (1994).

■ Tarver is the west coast manager of Port Import Export Reporting Service (PIERS), a division of *The Journal of Commerce.* PIERS operates a database that tracks all imports and exports transacted through U.S. ports. The Freedom of Information Act in conjunction with the U.S. Customs regulations authorizes press organizations to copy certain official shipping documents, such as manifests and bills of lading, and make them available to the public. The 125 reporters mentioned in Tarver's affidavit collect import and export information from all U.S. ports as contained on bills of lading, vessel manifests, and other official shipping documents submitted by steamship companies to the U.S. Customs Service. Additionally, PIERS has access to U.S. Customs' Automated Manifest System data tapes. These official shipping documents are made at or near the time by (or from information transmitted by) a person with knowledge and are kept in the course of regularly conducted shipping activity. It is the regular practice of the shipping industry, as required by federal law, to keep such records and information. Further, after collecting the data from these sources, the staff of PIERS regularly verifies that the information in its database is accurate. The trial court did not abuse its discretion in finding that Tarver's affidavit satisfies the foundational requirements of the business records exception.

■ Additionally, publications of market prices or statistical compilations that are proven to be generally recognized as reliable and regularly used in a trade or specialized activity by persons so engaged are admissible for the truth of the matter published. Tex.R. Evid. 803(17); *Curran v. Unis,* 711 S.W.2d 290, 296–97 (Tex. App.—Dallas 1986, no writ) (citing *Lewis v. Southmore Savs. Ass'n,* 480 S.W.2d 180, 186 (Tex.1972)). Tarver testified that the information in the PIERS database is relied upon by the public, U.S. Customs Service, U.S. Trade Development Offices, and other U.S. agencies, in addition to commercial offices of foreign governments, commercial banks and currency dealers, port authorities, consultants, equipment manufacturers, freight forwarders, importers and exporters, law firms, and manufacturers. PIERS information is regarded by these governmental agencies and pri-

vate entities as accurate and reliable in the same way as reports of interest rates posted in *The Wall Street Journal.* The exception to the hearsay rule for published compilations generally used and relied on by persons in particular occupations also supports the admission of Tarver's affidavit.

■ Mark Einfalt's affidavit contains as attachments pleadings and discovery submitted in this case, Daimler–Benz's and DBNAC's annual shareholder reports from 1990 through 1995, information from the web sites of Daimler–Benz, DBNAC, and MBNA, and several commercial reports. Daimler–Benz argues that the attachments are not properly identified and authenticated. Einfalt averred that, within his personal knowledge, the attachments are accurate copies of the original documents; Einfalt then identified the attachments. This testimony properly authenticates the attachments. Tex.R. Evid. 901(b)(1). Daimler–Benz's argument that documents printed from web sites must be authenticated by testimony establishing the system from which the printouts were obtained and the accuracy of the printouts was not presented to the trial court, and we do not consider it. Tex.R.App. P. 33.1(a).

Daimler–Benz also states globally that the commercial reports and web site documents attached to Einfalt's affidavit constitute hearsay. Assuming the trial court erroneously admitted these documents, however, Daimler–Benz fails to explain how their admission probably caused the rendition of an improper judgment. *See id.* 44.1(a). In addition, Daimler–Benz offers no argument that distinguishes among these documents. The documents showing their source as Daimler–Benz's web site, for instance, merit a different analysis than those labeled as commercial reports. Daimler–Benz's contention is too general to require us to search for error. We therefore decline to hold that the trial court abused its discretion in admitting Einfalt's affidavit and its attachments.

## PERSONAL JURISDICTION

### Minimum Contacts

Daimler–Benz contends that it lacked the systematic and continuous contacts with Texas required to confer general jurisdiction on Texas courts. We will examine the record for evidence of Daimler–Benz's activities in 1996, when the Olsons filed suit, and for a reasonable time before 1996. Our review will include evidence of Daimler–Benz's allegations in a federal lawsuit, the corporate structure of Daimler–Benz, its distribution agreement with MBNA, and its Internet web site.

Daimler–Benz presented evidence that it has never been authorized to do business and has never done business in Texas, has no officers, agents, or employees in Texas, does not own or possess any office, plant, or warehouse in Texas, and has no equipment, inventory, or books and records in Texas. Further, Daimler–Benz offered evidence that it has no mailing address, telephone listing, bank account, or other real or personal property in Texas. It has never appointed an agent for service of process in Texas and has never sold Mercedes–Benz cars in the U.S.

Daimler–Benz and the Olsons stipulated to certain facts in the trial court. They agreed that MBNA buys U.S.-version Mercedes–Benz vehicles in Germany from Daimler–Benz. MBNA ships those vehicles to U.S. ports of entry and then to various vehicle preparation centers, which MBNA owns or leases and operates. MBNA also ships parts it has bought from Daimler–Benz in Germany to U.S. ports of entry and then to parts distribution centers, which MBNA owns or leases and operates. Daimler–Benz and MBNA have executed a distribution agreement, which grants MBNA the exclusive right to import and distribute U.S.-version Mercedes–Benz passenger cars and parts for the U.S. The agreement also licenses MBNA to use certain Daimler–Benz trademarks. Daimler–Benz designs and manufactures U.S.-version Mercedes–Benz vehi-

cles to comply with applicable federal and state regulations so that they can be certified as compliant and sold to MBNA in Germany for marketing and distribution by MBNA in the U.S., including the state of Texas. Vehicles not intended for sale to MBNA are not necessarily so designed, manufactured, or certified.

The parties also agreed that the 1980 Mercedes–Benz 500SE Karen Olson was driving when the collision occurred was not a U.S.-version vehicle. The car was first sold to a customer in Stuttgart, Germany; neither Daimler–Benz nor any of its subsidiaries played any role in importing the car to the U.S. The car was designed and manufactured by Daimler–Benz in Germany for the European marketplace; it was not designed for the U.S., was not sold to a Daimler–Benz subsidiary for export to the U.S., and was not marketed in or placed by Daimler–Benz in a stream of commerce destined for the U.S. Daimler–Benz does, however, design, manufacture, and sell vehicles in a stream of commerce intended for the U.S. market, including the state of Texas.

Further, the parties stipulated that Daimler–Benz has never advertised the sale of Mercedes–Benz vehicles in Texas; rather, MBNA and its local, authorized dealers advertise U.S.-version Mercedes–Benz vehicles for sale in Texas. Neither entity advertises the sale of non-U.S.-version Mercedes–Benz vehicles in Texas.

■■■■ The parties' stipulations amount to judicial admissions, which normally are conclusive on the party making them. *See Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.1980). Although evidence controverting an admission is barred, a party relying on the admission must protect the record by objecting to the introduction of controverting evidence. *Marshall v. Vise,* 767 S.W.2d 699, 700 (Tex.1989); *Houston First Am. Savs. v. Musick,* 650 S.W.2d

764, 769 (Tex.1983). In this case, the Olsons submitted as evidence before the trial court the petition filed by Daimler–Benz and MBNA in 1998 in a Texas federal district court. *See Daimler–Benz Aktiengesellschaft v. Moghimi,* No. 3–98 Civ. 1308–H (N.D.Tex. Aug. 18, 1998).[3] Pleadings in another case that are inconsistent with a party's position in a present action are quasi-admissions, which are treated as some evidence. *DowElanco v. Benitez,* 4 S.W.3d 866, 871 (Tex.App.—Corpus Christi 1999, no pet. h.). We will set out the relevant allegations Daimler–Benz made in its petition in federal court before addressing the inconsistencies.

**1. Daimler–Benz's Federal–Court Petition**

■■■■ In its federal-court petition, Daimler–Benz and MBNA sued Ray Moghimi, a car dealer in Dallas, for unlawfully using federally registered trademarks and service marks. Daimler–Benz stated in the petition that it owned, and had registered in the United States Patent and Trademark Office, the famous trademarks and service marks Mercedes–Benz and the design of a three-pointed star. Daimler–Benz alleged that it had continuously, over many decades, used its trademarks and service marks throughout the state of Texas to identify and distinguish its cars, parts, accessories, and related products, as well as the maintenance and repair services furnished by its licensed dealers. Numerous Mercedes–Benz cars, parts, and accessories, and extensive maintenance and repair services, have been advertised and furnished under these marks by authorized dealers in Texas. Daimler–Benz and MBNA have spent large sums of money to use, promote, and advertise the trademarks and service marks in commerce, with the result that the marks have attained "extraordinary fame and inestimable good will" and now rank among the

---

**3.** Although Daimler–Benz and MBNA filed the petition in *Moghimi* in 1998, their allegations cover activities that occurred during the time relevant to our analysis, 1996 and a reasonable time beforehand.

most distinctive marks in Texas. Because of their long and extensive use, Daimler–Benz and MBNA's marks have become recognized by the public as identifying Daimler–Benz and MBNA and the quality cars, parts, accessories, and services sold by them and their authorized dealers. The excellence of these products and services has earned Daimler–Benz · and MBNA "a valuable reputation and tremendous goodwill" with the public, symbolized by the trademarks and service marks. Daimler–Benz and MBNA alleged that by unlawfully using the trademarks and service marks, Moghimi had engaged in unfair competition, had intended to injure their business operations, and had injured their business reputation and interfered with their advantageous business relationships.

The allegations of the petition conflict with the parties' stipulations as to Daimler–Benz's advertising: while the parties stipulated that Daimler–Benz itself has never advertised Mercedes–Benz vehicles in Texas, Daimler–Benz pleaded in federal court that it had spent large sums of money to advertise its trademarks and service marks, with the result that its marks had attained inestimable good will and now ranked among the most distinctive in Texas. Because Daimler–Benz failed to object to the controverting statement on the ground that it was relying on the stipulation, it has waived its right to rely on the stipulation. *Marshall,* 767 S.W.2d at 700. The controverted stipulation as to advertising is thereby reduced to the status of a quasi-admission, which is not conclusive, but is merely some evidence for the fact finder to consider. *See Mendoza,* 606 S.W.2d at 694. The allegations in the federal-court petition as to advertising, being likewise controverted, also remain quasi-admissions. *DowElanco,* 4 S.W.3d at 871.

**2. Judicial Admissions**

■ The remaining allegations in Daimler–Benz's petition in federal court, summarized, are that Daimler–Benz owned and had registered in this country certain trademarks and service marks; that Daimler–Benz had long used its marks throughout Texas to identify its cars; that this long and extensive use had caused the public to recognize the marks as identifying Daimler–Benz and the cars it sold; that the excellence of the cars had earned Daimler–Benz a valuable reputation and tremendous goodwill, which were symbolized by its marks; and that the unlawful use of its marks constituted unfair competition, was intended to injure Daimler–Benz's business operations, and had injured its business reputation and interfered with its business relationships. As stated, pleadings in another case that are inconsistent with a party's position in a present action are quasi-admissions. *Id.* If certain conditions are met, however, quasi-admissions can rise to the level of formal judicial admissions. *Mendoza,* 606 S.W.2d at 694; *DowElanco,* 4 S.W.3d at 871. The policy underlying this rule is that it would be unjust to allow a party to recover after it has negated its right to recover by clear, unequivocal evidence. *Mendoza,* 606 S.W.2d at 694; *DowElanco,* 4 S.W.3d at 871.

To be treated as judicial admissions, quasi-admissions must meet five criteria: (1) the statements relied on were made during the course of a judicial proceeding; (2) the statements are contrary to an essential fact embraced in the theory of recovery or defense asserted by the person making the statements; (3) the statements were deliberate, clear, and unequivocal; (4) giving conclusive effect to the statements will be consistent with the policy on which the rule is based; and (5) the statements are not also destructive of the opposing party's theory of recovery. *Mendoza,* 606 S.W.2d at 694; *United States Fidelity & Guar. Co. v. Carr,* 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd).

■ The statements we have summarized were made in a judicial proceeding, are contrary to Daimler–Benz's assertion

here that it lacks contacts with Texas, and are not destructive of the Olsons' theory of recovery. Further, the statements deliberately and unequivocally recount Daimler–Benz's activities in propagating its trademarks and service marks throughout Texas. Giving conclusive effect to these statements is consistent with the policy that a party should not be allowed to prevail on its assertions after clearly negating those assertions before a judicial tribunal. Because the allegations in Daimler–Benz's federal-court petition meet the requirements for being considered judicial admissions, Daimler–Benz is bound by those allegations in this suit.[4] We therefore consider it established that Daimler–Benz's long and extensive use in Texas of its trademarks and service marks has caused the public to identify the marks with Daimler–Benz and the cars it produces. The excellence of its cars has earned Daimler–Benz a valuable reputation with the public, which is also symbolized by its marks. It is necessarily implied from Daimler–Benz's allegations that it has engaged in competition and has established business relationships and business operations in Texas. *See Hutcherson v. Sovereign Camp, W.O. W.,* 112 Tex. 551, 251 S.W. 491, 492 (1923) (trial court may find inferential facts that, as matter of law, are necessarily inferred from facts judicially admitted); *Davis v. State,* 904 S.W.2d 946, 950–51 (Tex.App.— Austin 1995, no writ). Thus, the allegations show that Daimler–Benz used its marks in Texas to create recognition for itself as part of a system of marketing its vehicles in Texas. Daimler–Benz established business operations in Texas and competed in the Texas marketplace for vehicle sales. Daimler–Benz's marketing system, which also involved its subsidiary MBNA and numerous dealerships, had economic value, which Daimler–Benz acted to protect by resort to the judicial system.

### 3. Alter Ego

■ Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there. But if the parent corporation exerts such dominance and control over its subsidiary that the subsidiary is simply a conduit through which the parent conducts its business, the parent may be considered to be doing business through the local activities of its subsidiaries. *Jones v. Beech Aircraft,* 995 S.W.2d 767, 771 (Tex.App.—San Antonio 1999, pet. dism'd w.o.j.); *Moffett v. Goodyear Tire & Rubber Co.,* 652 S.W.2d 609, 613 (Tex.App.—Austin 1983, writ ref'd n.r.e.). The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship. *Conner,* 944 S.W.2d at 419.

■ Courts must examine all relevant circumstances to determine whether the parent and subsidiary should be considered separate or joined; a variety of factors have guided courts in making this determination: whether distinct and adequately capitalized financial units are incorporated and maintained; whether daily operations of the two corporations are separate; whether formal barriers between the management of the two entities are erected, with each functioning in its own best interest; whether the two file consolidated tax returns; whether operating capital is financed by the parent or borrowed from other sources; whether the subsidiary's stock is owned by the parent; whether the two share common officers and directors; the extent to which separate books and accounts are kept;

---

4. Daimler–Benz stated in the federal-court petition that the public recognizes its marks as identifying it and MBNA "and the automobiles, parts, accessories and maintenance, repair and related services sold and furnished by [Daimler–Benz and MBNA] and their authorized dealers." Because Daimler–Benz did not allege that it sold cars directly to U.S. buyers, we do not consider this allegation to contradict the system of distribution stipulated to by the parties.

whether both have common departments of businesses; whether they have separate meetings of shareholders and directors; whether an officer or director of the one corporation is permitted to determine the policies of the other; whether those with whom the corporation comes into contact are apprised of their separate identity; and the extent to which contracts between the parent and subsidiary favor one over the other. *Conner*, 944 S.W.2d at 419; *Moffett*, 652 S.W.2d at 613. The Olsons bore the burden of proving the type of close relationship that would enable the court to disregard the separate corporate structures. *Jones*, 995 S.W.2d at 771.

Not all of the above factors need be present or considered. In *Jones*, the court of appeals analyzed the relationship between a parent corporation and its two subsidiaries and focused on several factors indicating that the corporations should be considered as one for purposes of personal jurisdiction: the corporations shared common ownership, officers, and directors; the parent exercised control over the daily operations of the subsidiaries; and the clients of the subsidiaries were not apprised of the separate identity of each entity. 995 S.W.2d at 772–73. Additionally, the court described one subsidiary as existing solely to funnel sales to the parent and the other as directing customers to the parent for sales. *Id.* at 772.[5]

a. *Corporate Structure and Inter–Corporate Relations*

■ Daimler–Benz submitted evidence that it and MBNA have separate officers and directors and that the two corporations have always formally maintained their separate corporate existences. Daimler–Benz has always kept its books, records, tax returns, and financial statements

separate from those of MBNA. All real and personal property that MBNA uses or controls has been owned by it or leased by it from parties other than Daimler–Benz.

Undisputed evidence in the record shows that MBNA does business in Texas. The parties stipulated that MBNA is qualified to do business in Texas. As mentioned above, the parties stipulated that MBNA advertises U.S.-version Mercedes–Benz cars for sale in Texas; MBNA's advertising appears in publications and newspapers directed to Texas and is broadcast over television and radio stations throughout Texas. The evidence shows that MBNA, as the exclusive U.S. distributor of Mercedes–Benz cars, selects its Mercedes–Benz dealers and forms contractual relationships with them. MBNA also supervises the performance of the dealers, has authority to terminate dealers, and handles the detailed accounting and record-keeping associated with the dealers. MBNA's dealer network extends throughout the U.S., including the state of Texas. The parties agreed that up until 1995, MBNA shipped Mercedes–Benz cars from Germany to the Houston Port Authority, from which point the cars were transported to a vehicle preparation center near Houston. Documents admitted in evidence show that from 1987 through 1990, MBNA imported more than 18,400 Mercedes–Benz vehicles into Texas through the Port of Houston. In 1995, 40,609 Mercedes–Benz vehicles from model years 1985 through 1995 were in operation in Texas. To the extent Daimler–Benz disputes that MBNA does business in Texas, MBNA's pleadings as co-plaintiff in *Moghimi* constitute an admission that MBNA competes in the Texas marketplace and has established business relationships, a

---

5. Although many of the factors relevant to our analysis may also be relevant in determining whether a parent corporation should be liable for the actions of its subsidiary, the determination whether two corporate entities are one and the same for jurisdictional purposes is distinct. *See Jones*, 995 S.W.2d at 771; *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159

(5th Cir.1983); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 425 (9th Cir.1977). The operative question here is whether MBNA is in fact a mere "division" or "branch" of a larger whole, such that MBNA's contacts with Texas should be attributed to Daimler–Benz. *See Wells Fargo & Co.*, 556 F.2d at 425.

business reputation, and business operations in Texas. Following our analysis above, we consider these admissions to be judicial admissions.

The Olsons submitted in evidence Daimler–Benz's annual shareholder reports for the years 1990 to 1995. These show that financing for companies within the Daimler–Benz Group is handled by Daimler–Benz and its regional finance companies; the finance companies procure funds on national and international markets and pass the funds on to the operating companies. Daimler–Benz also arranges at least some aspects of purchasing for its operating companies.

In the section of Daimler–Benz's 1992 through 1994 annual shareholder reports titled, "The Corporate Principles of Daimler–Benz," Daimler–Benz described itself as an international company and wrote, "Daimler–Benz does business in all corners of the globe." In a speech given in October 1997, the chairman and chief executive officer of MBNA described MBNA as "the organization that links our parent company in Germany and our 320 dealers across the United States." Daimler–Benz considers the U.S. to be its largest foreign market. In Daimler–Benz's annual shareholder reports from 1990 through 1995, management's business review consistently discussed sales of Mercedes–Benz cars in the U.S. in terms of "our" sales and the number of cars "we" sold.

The financial statements are presented primarily on a consolidated basis for the entire Daimler–Benz Group, although certain figures are reported separately for Daimler–Benz. This format was adopted in the 1992 report, when the chairman of Daimler–Benz's board of management stated that the company would concentrate on the consolidated financial statements, rather than Daimler–Benz's individual performance, to reflect the growing internationalization of the company. Notes to the consolidated financial statements in the 1992 report say that profits earned by subsidiaries of Daimler–Benz are added to consolidated retained earnings.

Although Daimler–Benz and MBNA do not appear to be managed by the same individuals, Daimler–Benz describes itself as the "managing holding company" of the Daimler–Benz Group, and one member of Daimler–Benz's Board of Management is shown in the 1994 shareholder report as being responsible for Daimler–Benz's subsidiaries. The companies within the Daimler–Benz Group contribute remuneration each year to the members of Daimler–Benz's Board of Management. Among its principal subsidiaries, Daimler–Benz classifies MBNA as a sales company, rather than a finance, manufacturing, holding, or service company. Although not mentioning MBNA specifically, Daimler–Benz related in its 1993 shareholder report that in the context of subsidiary administration, it followed and assessed ongoing projects of subsidiary companies and drafted decisions for the "internal bodies."

As discussed more fully below, Daimler–Benz requires MBNA to display Daimler–Benz's trademarks, including its three-pointed star. This well-known trademark, valuable to Daimler–Benz in promoting sales of its cars, does not allow customers to distinguish Daimler–Benz from its subsidiary MBNA or the numerous authorized dealers in Texas.

Our review of this evidence shows Daimler–Benz as a company devoted to selling its cars worldwide, including in Texas. To achieve this goal, Daimler–Benz has established subsidiaries in important markets around the globe. Although Daimler–Benz strictly observes corporate formalities, MBNA essentially connects Daimler–Benz to markets in the U.S., including Texas. Daimler–Benz holds itself out to investors as a corporation that does business in all corners of the globe. MBNA's classification as a sales company demonstrates that its function is to generate sales for Daimler–Benz. The confusion of identity created by MBNA's use of Daimler–Benz's three-pointed star is some evi-

dence that Daimler–Benz is doing business through MBNA. Daimler–Benz also exercises significant functions for MBNA and its other subsidiaries, such as obtaining financing and coordinating purchasing. Further, the management of Daimler–Benz closely supervises and directs the activities of its subsidiaries. Thus, while formally separate, Daimler–Benz and MBNA form a functional whole in promoting and marketing vehicles in Texas.

### b. *Distribution Agreement*

■ The distribution agreement in effect between Daimler–Benz and MBNA at the time of Karen Olson's accident was submitted to the trial court as an attachment to the parties' stipulations. As a part of the parties' stipulations, the agreement carries the weight of a judicial admission. By means of the distribution agreement, Daimler–Benz conferred on MBNA the exclusive right to distribute within the U.S. passenger cars and parts manufactured by Daimler–Benz for the U.S. market. The agreement obligates MBNA to strive for maximum imports and sales of Mercedes–Benz vehicles. The agreement also gives Daimler–Benz the right, in a number of situations, to determine the details of MBNA's daily operations. Under the agreement, MBNA must inform Daimler–Benz of the prices it charges buyers and dealers, and on Daimler–Benz's request, MBNA must determine its sales prices in consultation with Daimler–Benz. To maximize imports and sales, Daimler–Benz has the right to determine, together with MBNA, purchase figures and planning schedules; if the parties cannot agree, the figures determined by Daimler–Benz apply. If the parties cannot agree on the minimum quantity of vehicles MBNA must keep in stock, Daimler–Benz can determine the minimum quantity. Likewise, in the absence of agreement, Daimler–Benz determines the number and assortment of demonstration vehicles MBNA must keep in stock. When MBNA performs warranty work, it must submit the warranty claim to Daimler–Benz and keep the parts that have been replaced. Daimler–Benz is entitled to examine the claim and the parts to determine whether the claim was justified. MBNA must report regularly to Daimler–Benz on all advertising and sales promotions it and its dealers adopt and must report on their results, including a statement of expenditures and copies of the sales materials. Daimler–Benz may pass on to other general distributors any sales and promotional materials remitted by MBNA. Daimler–Benz reserves the right under the agreement to demand that MBNA discontinue or alter its advertising and canvassing activities. If MBNA is unable to conclude a transaction, it must inform Daimler–Benz so that Daimler–Benz can help with the transaction. MBNA must submit its annual balance sheet and earnings statement to Daimler–Benz so that Daimler–Benz can advise MBNA on business management. Daimler–Benz can at any time send a representative to the U.S., whom MBNA must help to carry out his assignment, in particular by supplying information and permitting records to be inspected. Daimler–Benz must agree to the design of all documents bearing MBNA's name.

The distribution agreement also authorizes Daimler–Benz to impose its standards on MBNA throughout MBNA's management and operations. The stock of vehicles that MBNA agrees to maintain must be organized according to Daimler–Benz's principles. MBNA must maintain showrooms that are "commensurate with the prestige of" Daimler–Benz. MBNA is to organize its sales network to conform with Daimler–Benz's standards relating to the size and equipping of sales premises, work organization and planning systems, and the use of data processing systems recommended by Daimler–Benz. MBNA is responsible for training its personnel in sales, service, parts systems, and business management and organization to conform with Daimler–Benz's standards. MBNA also agrees to provide servicing, maintenance and repair work for Mercedes–Benz

vehicles in conformance with Daimler–Benz's standards. As part of its servicing obligations, MBNA agrees to carry out warranty work on vehicles and parts supplied by Daimler–Benz in accordance with Daimler–Benz's directives. MBNA must perform warranty work on vehicles irrespective of where they were sold, including foreign versions of Daimler–Benz's vehicles, and must process warranty claims according to the instructions set out in Daimler–Benz's manual for warranty procedure. All workshops used to provide service to customer vehicles must meet Daimler–Benz's standards regarding size, personnel, equipment, and organization. MBNA is to impose the same obligations accepted by it under the agreement on all authorized workshops, service stations, and other workshops with which it enters dealer agreements. Finally, MBNA must observe Daimler–Benz's directives in carrying out its advertising and canvassing activities.

The agreement expressly provides that it is in the common interest of Daimler–Benz and MBNA to establish a corporate identity for the dealer network worldwide. To further this corporate identity, MBNA must observe Daimler–Benz's directives in designing its interior and exterior premises, its outdoor advertising, and its stationery. In pursuing its activities under the agreement, MBNA has the duty to use Daimler–Benz's names, trademarks, and service marks, subject to Daimler–Benz's approval of the manner of this use. The agreement also requires MBNA to develop its market territory systematically and obligates MBNA to spare no effort to sell Daimler–Benz's vehicles and "to represent directly and indirectly the interests of" Daimler–Benz. The agreement disclaims an agency relationship between Daimler–Benz and MBNA, stating that the relationship between the parties is that of vendor-vendee and that MBNA has no right to bind Daimler–Benz in any manner without Daimler–Benz's written consent.

The terms of the agreement we have set forth directly align MBNA's interests with Daimler–Benz's interest in maximizing the sales of its vehicles in the U.S. The agreement specifically authorizes MBNA to represent, "directly and indirectly," Daimler–Benz's interests in the United States and requires MBNA to further those interests. As detailed above, the agreement gives Daimler–Benz extensive control over the details of MBNA's management and operations.

In contrast to the distribution agreement, the parties stipulated that MBNA is a separately operated subsidiary of Daimler–Benz. Daimler–Benz also submitted evidence that Daimler–Benz has never participated in the day-to-day conduct of MBNA's business and that, once it has sold cars and parts to MBNA in Germany, Daimler–Benz exercises no control over MBNA in its subsequent sales. Granting that this evidence conflicts with the distribution agreement, we will consider the distribution agreement not as conclusive evidence, but as some evidence to be weighed with other evidence in the record. Nevertheless, considering the distribution agreement with the evidence of Daimler–Benz's corporate structure, we believe that it is proper to view Daimler–Benz as doing business in Texas through the activities of MBNA.

**4. Internet Web Site with E-mail**

The parties stipulated that Daimler–Benz maintains an Internet web site by means of which individuals around the world, including those in Texas, can communicate with it electronically. The web site offers Internet users information about Daimler–Benz and its worldwide products and services. On one subdirectory entitled "Mailing Service," Texas residents can register with Daimler–Benz to receive direct mailings from Daimler–Benz electronically. Another subdirectory allows Texas residents to communicate with and request replies from Daimler–Benz representatives. Daimler–Benz does not offer Mercedes–Benz vehicles for sale to

Texas residents over the Internet, but refers sales inquiries from the U.S. to MBNA. MBNA maintains an independent web site on which it advertises U.S.-version Mercedes–Benz vehicles available for sale at authorized dealers throughout the U.S., including Texas.

■ In Texas, the continuum of Internet activities is divided into three categories for purposes of personal jurisdiction. At one end of the scale, defendants who make contracts with residents of other jurisdictions that involve the knowing and repeated transmission of computer files electronically do business over the Internet. *Jones,* 995 S.W.2d at 772. At the other end of the scale, defendants who establish passive web sites that do no more than make information available to Internet users do not provide grounds for personal jurisdiction. *Id.* In between lie interactive web sites, which allow users to exchange information with a host computer, communicating with the person or company that runs the web site. In these cases, the exercise of jurisdiction depends on the level of interactivity between the parties on the web site. *Id.*

■ The web site Daimler–Benz maintains is interactive, allowing Texas residents to submit comments and questions to Daimler–Benz representatives and to receive electronic mailings from Daimler–Benz. Daimler–Benz, however, makes no sales or other contracts through its Internet web site. While this level of interactivity standing alone might not be enough to subject Daimler–Benz to jurisdiction in Texas, we will consider it a factor, along with the other contacts that exist in this case.[6]

■ The evidence as a whole shows that Daimler–Benz advertises its cars in Texas, that MBNA functions essentially as an exclusive sales conduit for Daimler–Benz, and that Daimler–Benz solicits communication from Texas residents through its web site. It is conclusively established that Daimler–Benz has business operations and relationships in Texas and that it competes in the Texas marketplace. Implied findings in these respects support the legal conclusion that Daimler–Benz has engaged in systematic and continuous contacts with Texas. Because we have determined that Daimler–Benz is subject to general jurisdiction, we need not consider whether specific jurisdiction exists.

### Fair Play and Substantial Justice

■ Finally, Daimler–Benz argues that, under the second prong of the due process test, the exercise of jurisdiction by a Texas court fails to comport with traditional notions of fair play and substantial justice. *Guardian Royal,* 815 S.W.2d at 228. In deciding this issue, we consider the following factors: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. When the defendant is a resident of another nation, the court must also consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by a state court as well as the

---

6. Although the parties' stipulations as to Daimler–Benz's web site are stated in the present tense and appear to have been made in 1998, other evidence shows that the web site existed in 1996. In its 1995 annual report, Daimler–Benz stated that it had improved its customer interaction system for use on the World Wide Web; Daimler–Benz's customer interaction system allowed customers to choose a model, color, and options to compose their ideal car on a personal computer screen. The advanced features available on Daimler–Benz's web site in 1998, such as live coverage of the shareholders' meeting, a history game visitors could play for prizes, a guest book, and an order service, make it reasonable to infer that the interactive features described in the parties' stipulations existed in 1996.

federal government's interest in its foreign relations policies. *Id.* at 229.

 In this case, Daimler–Benz's significant business contacts with Texas lessen the burden on it to defend the suit in Texas. Daimler–Benz itself has already initiated litigation in a Texas court, showing that it is capable of pursuing its legal interests in Texas and is not unfamiliar with Texas jurisprudence. Texas's interest in protecting its citizens from defective cars that cause injury and death within its territory is strong. The Olsons have also sued the company owning the van that collided with Karen, and Texas undisputedly has jurisdiction over this company. The most convenient and efficient way to resolve the entire controversy is to allow the Olsons to proceed against Daimler–Benz in the same suit in Texas. Thus, the Olsons' interest in obtaining convenient and efficient relief also weighs in favor of jurisdiction in Texas.

The evidence shows that Daimler–Benz places a large volume of vehicles into a stream of commerce destined for the United States and that Daimler–Benz's stock is traded on the New York Stock Exchange. The federal government's foreign policy interests are not hindered when individual states ensure that large international companies operate in an equitable business environment in which wrongs are redressed by those responsible. The parties also stipulated that Daimler–Benz maintains general liability insurance, including products liability insurance, covering claims made against it worldwide. Such protection being consonant with business policies in Germany, to allow recovery on such insurance following a judicial determination of liability would not appear to violate Germany's policies. We conclude that the assertion of personal jurisdiction by the district court comports with traditional notions of fair play and substantial justice.

## CONCLUSION

Having determined that Daimler–Benz has established minimum contacts with Texas and that the assertion of jurisdiction comports with fair play and substantial justice, we overrule Daimler–Benz's two issues. We affirm the order of the district court.