**BMC SOFTWARE BELGIUM, N.V., Appellant,**

v.

**Michael MARCHAND, Appellee.**

**No. 14–99–01060–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 17, 2000.

Merritt B. Chastain, III, Thomas H. Wilson, Houston, for appellant.

Stuart M. Nelkin, Houston, for appellee.

Panel consists of Chief Justice MURPHY and Justices HUDSON and WITTIG.

## OPINION

WITTIG, Justice.

BMC Software Belgium, N.V., appeals from the trial court's interlocutory order denying its special appearance contesting personal jurisdiction. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2000). BMC Belgium's contractor/employee Marchand, claims he was unlawfully denied stock options in the parent company, BMC Software, Inc., of Houston. Because we agree that appellant has sufficient minimum contacts with the forum

state and that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice, we affirm the trial court's order.

## I. Background

This case involves claims by Michael Marchand against BMC Software, Inc., of Houston ("BMC"), and BMC Software Belgium, its wholly owned subsidiary ("BMC Belgium"). Marchand, a citizen and resident of Belgium, worked for Platinum Technologies, a competitor of BMC and BMC Belgium. Marchand entered into negotiations to leave Platinum and to go to work for BMC Belgium as a "country manager." He eventually met with Gerd Ordelheide, senior vice president of European operations for BMC and president of BMC Belgium.

At that meeting, Marchand alleges, Ordelheide confirmed that as part of the compensation package Marchand was to receive 20,000 options for shares of BMC stock.[1] Marchand alleges that Ordelheide told him that if Marchand were interested in joining BMC Belgium, Ordelheide would be required to obtain approval for the grant of stock options from Max Watson, chairman of the board of directors and chief executive officer of BMC in Houston. Soon thereafter, Ordelheide informed Marchand that the grant of options had been approved.

Marchand alleges that he subsequently met with Ordelheide and two representatives of both BMC and BMC Belgium to finalize the employment agreement. The parties agreed to the terms by which Marchand would work for BMC Belgium. The

agreement was memorialized by a March 29, 1996, letter, detailing some of the terms and specifically providing for the 20,000 share options in BMC, subject to BMC board approval. The letter, on "BMC Software" letterhead, was signed by Adri Kok and another individual, both identified as directors of BMC Belgium. The terms were further modified, memorialized by a memo dated April 1, 1996, again on "BMC Software" letterhead and signed by Kok and Marchand. The final management agreement was signed June 13, 1996, by Kok and Ordelheide, as directors for BMC Belgium, and by Marchand, as director of Procurement N.V., identified as a contractor. This final original agreement was in German. The parties agreed that this contract, describing the working relationships, would be governed by Belgium law and that the court at Brussels would have exclusive jurisdiction. However, the BMC "Employee Incentive Plan" dealing with stock options, (specifically defining subsidiary's employees as BMC employees), contains a general Texas choice-of-law clause.[2]

On April 22, 1996, Marchand began working for BMC Belgium. He made several unsuccessful attempts to obtain the BMC options that he alleges he had been promised. In July 1997, Marchand was notified that he was being terminated. In February 11, 1998, Marchand, through an attorney, demanded the BMC options he purportedly had been promised. After this final refusal, he filed suit.

## II. Discussion

BMC Belgium raises two issues: whether the trial court erred in (1) denying

---

1. Although Marchand alleges he was offered 20,000 shares of stock, the evidence before the trial court suggests he was offered 20,000 share options.

2. More specifically the contract provides: "(g) Governing Law. This Plan shall be con-

strued in accordance with the laws of the State of Texas, except to the extent that it implicates matters which are the subject of the General Corporation Law of the State of Delaware which matters shall be governed by the latter law."

BMC Belgium's special appearance because BMC Belgium has engaged in no purposeful act within Texas, had no minimum contacts with Texas, and is not the alter ego of BMC, and (2) denying the special appearance because to assert jurisdiction over BMC Belgium offends traditional notions of fair play and substantial justice.

◾ The existence of personal jurisdiction is a question of law. *See BHP de Venezuela a/k/a BHP Venca v. Casteig*, 994 S.W.2d 321, 326 (Tex.App.—Corpus Christi 1999, pet. denied). To resolve a question of personal jurisdiction, the district court often must resolve underlying factual disputes. *See Dowelanco v. Benitez*, 4 S.W.3d 866, 870 (Tex.App.—Corpus Christi 1999, no pet.). We review the resolution of these factual disputes under an ordinary sufficiency of the evidence standard. *See Smith v. Lanier*, 998 S.W.2d 324, 329 (Tex.App.—Austin 1999, pet. denied). If the evidence supports the implied finding of fact, we must uphold the district court's judgment on any theory supported by the evidence. *See Fish v. Tandy Corp.*, 948 S.W.2d 886, 892 (Tex. App.—Fort Worth 1997, writ denied). When the district court does not file findings of fact in a special appearance, all questions of fact are presumed to support the judgment. *See Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 802 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). The presumption is that the court has jurisdiction over the parties; the nonresident defendant must negate all possible bases of personal jurisdiction. *See Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985).

◾ For a Texas court to exercise jurisdiction over a nonresident defendant, the Texas long-arm statute must authorize the exercise of jurisdiction, and the exercise of jurisdiction must be consistent with federal and state due-process guarantees. *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex.1990). The long-arm statute authorizes jurisdiction over a nonresident defendant (1) where the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas, and (2) where the nonresident commits a tort in whole or in part in Texas. *See* Tex.Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997). The statute also permits the exercise of personal jurisdiction where the nonresident is "doing business" in Texas by "other acts." *See id.* The broad language of the statute's "doing business" requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

◾ To comply with the federal constitutional standard, Texas uses the following test: (1) The nonresident defendant must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, the act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. *See Schlobohm*, 784 S.W.2d at 358.

◾ The first prong of the jurisdictional analysis is to determine whether the nonresident defendant "purposefully" established "minimum contacts" with the state. *See Guardian Royal*, 815 S.W.2d at

230. In establishing minimum contacts, a court may have "general" or "specific" jurisdiction over the defendant. *See id.* General jurisdiction exists where the defendant has maintained continuous and systematic contacts with the forum state so that it is amenable to all suits there. *See id.* Specific jurisdiction exists where the injury to the plaintiff arises out of the minimum contacts with the forum state. *See id.* Specific jurisdiction may arise without the nonresident defendant setting foot upon the forum state's soil or may arise from the commission of a single act directed at the forum. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In determining whether the exercise of jurisdiction comports with the traditional notions of fair play and substantial justice, the court considers (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Guardian Royal,* 815 S.W.2d at 228. When the defendant is a resident of another nation, the district court also must consider (a) the unique burdens placed upon the defendant who must defend itself in a foreign legal system, and (b) the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations polices. *See id.* at 229.

## A. General Jurisdiction

[17] We will examine first the question of general jurisdiction. When we view the evidence before the trial court in the light most favorable to the trial court's decision, we find BMC Belgium had sufficient continuous and systematic contacts with the parent company, and thus the forum state, to satisfy the trial court's finding of minimum contacts.

The proof before the trial court showed that Ordelheide, who Marchand said was a representative of both BMC Belgium and BMC, contacted Max Watson, chairman and CEO of Houston-based BMC, to obtain approval for the grant of the 20,000 options at issue. The proof further shows that the offer was approved in Houston and passed back to Ordelheide. The subject property of the various transactions, stock in Houston based BMC, could be finally negotiated, agreed, approved, and issued only in Houston.

Further, Watson, in his deposition, testified that the subsidiaries, necessarily including BMC Belgium, were responsible for the sales and support of the parent's software and services. According to Watson, BMC sold its products outside the U.S. through its sales force, including its subsidiaries. He testified that the employees of the subsidiaries were considered by BMC part of the parent's sales force. The 1,900 "employees" of BMC included the "employees" of its many subsidiaries and therefore, inevitably, the "employees" of BMC Belgium. Watson further testified that Ordelheide met several times with him in Texas. Ordelheide was described as a senior vice president with the parent, BMC, and president of the subsidiary, BMC Belgium. The annual report further shows that the financial performance of the subsidiaries was included in the BMC annual report. BMC Belgium continuously and systematically acquired for redistribution products developed, sold, and supported by BMC in Houston. By necessary inference, without BMC, there was no product or service for BMC Belgium to sell or service. BMC Belgium systematically provided to its employees BMC

stock options as part of an employee incentive plan approved by the Houston-based parent. Further BMC's annual report illustrates that the subsidiary, as part of the overall corporate family, provided its financial data for inclusion in BMC reports.

It is important that appellate courts attempt, at least, to see through the eyes of the trial court or fact finder. The only product BMC Belgium had to sell was the software and services of the BMC parent. These all originate in Houston. Every penny BMC Belgium made went to the bottom line of BMC. If BMC Belgium were some kind of truly independent entity, not solely selling the products and services originating in Houston, then both the annual report of BMC and its corresponding SEC filings would be false. BMC Belgium provided no evidence that it was anything other than a sales agent for BMC, whose employees' very employment was approved in Houston, who were all listed as employees of BMC, whose stock options were approved and issued in Houston, and whose stock incentive plan was governed generally by the laws of Texas.

The trial court could infer from this proof an ongoing business relationship in which the subsidiary maintained regular contact with the Houston-based parent. Indeed, without the life blood of every business, its products and services, BMC Belgium would be no more than the shriveled corpse of a Delaware shelf corporation. BMC Belgium did only marketing for BMC. This proof and the inferences that may be drawn from this proof suggest that the subsidiary necessarily had a continuous and systematic business relationship with the parent sufficient to establish the minimum contacts necessary to allow the Texas court to exercise general personal jurisdiction over the subsidiary. *See Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 674 (Tex.App.—Dallas 1993, writ dism'd by agr.) (out-of-state corporation's routine purchases from Texas-based corporation helps establish minimum contacts necessary for general jurisdiction).

BMC Belgium argues that the evidence is not legally sufficient to establish that BMC Belgium was the alter ego of BMC. We need not decide this issue. We conclude, rather, that the trial court was entitled to find that the continuous and systematic contacts between the subsidiary and the parent were sufficient to find the minimum contacts needed to exercise general personal jurisdiction by a Texas court.

**B. Specific Jurisdiction**

Even though a finding of general jurisdiction is sufficient to support the suit, we also determine that the trial court would not have erred by finding that BMC Belgium failed to negate all possible methods of establishing specific jurisdiction. If a cause of action arises from or is related to the nonresident defendant's contacts with the state, a case for exercising jurisdiction over the nonresident defendant will be much more compelling. *See Beechem v. Pippin*, 686 S.W.2d 356, 361 (Tex.App.—Austin 1985, no writ).

The evidence shows that Ordelheide was required to obtain permission from the Houston office to offer the options to Marchand. Also, Ordelheide specifically counseled with Watson, CEO of the Houston-based company, in connection with Marchand's hiring. This was accomplished in Texas at various meetings. In particular, Ordelheide and Watson discussed the inability or difficulty of BMC to provide stock options to Marchand because Marchand technically was the employee of an independent contractor rather than an employee of BMC Belgium. The very stock options at the heart of the controversy could only be recommended by BMC Belgium in

Houston and approved by BMC's board of directors in Houston. Neither Belgium nor Marchand could achieve actual issuance of the disputed stock anywhere but Houston; all or part of the performance of the alleged stock-option contract could only occur in Houston.

There was legally sufficient evidence, should the trial court have chosen to believe it, that BMC Belgium had sufficient minimum contacts with the Texas-based parent in connection with this transaction to establish specific jurisdiction. *See Ramm v. Rowland,* 658 F.Supp. 705, 708–09 (S.D.Tex.1987) (several phone calls and a few letters in connection with the specific tort at issue sufficient to establish specific jurisdiction); *Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650–51 (Tex.App.—Houston [14th Dist.] 1992, no writ) (single phone call relaying allegedly false information that was subject of suit sufficient to establish minimum contacts for specific jurisdiction).

### C. Due Process

 To defeat the fair play and substantial justice prong of due process, a nonresident defendant must present a compelling case that the exercise of jurisdiction would be unreasonable. *See In re S.A.V.,* 837 S.W.2d 80, 85 (Tex.1992). Only in rare instances will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *See Guardian Royal Exch.,* 815 S.W.2d at 231. This is true because the minimum-contacts analysis encompasses so many considerations of fairness. *See Schlobohm,* 784 S.W.2d at 357–358. Nor is distance alone ordinarily sufficient to defeat jurisdiction; modern transportation and communication have made it much less burdensome for a party sued to defend

himself in a state where it engages in economic activity. *See Guardian Royal Exch.,* 815 S.W.2d at 231.

 Much of the negotiation between Marchand and Ordelheide occurred in Europe. Many of the records and witnesses are also in Europe. There is proof, which the district court could have chosen to believe, that BMC Belgium had continuous and systematic business relations with its parent in that it acquired and distributed software developed by the parent. Moreover, presumably the records regarding the grant, or lack thereof, of the stock options lies in the Texas home office. Texas has some interest in resolving the dispute between the parties, where the allegation is that the parent in connection with the subsidiary engaged in a plan to deny the promised delivery of certain options. Bringing into a Texas court both the parent and the subsidiary would seem to be the most efficient manner of resolving the dispute involving the options purportedly offered by the subsidiary. The plaintiff has chosen Texas as the forum for obtaining the most convenient and effective relief. Although it is somewhat inconvenient for the foreign subsidiary to present itself in a Texas court, matters of convenience will seldom defeat an exercise of jurisdiction. *See id.*

The trial court's finding of personal general jurisdiction over the BMC Belgium does not offend traditional notions of fair play and substantial justice. We find that the trial court did not err in denying BMC Belgium's special appearance.

### III. Conclusion

The trial court did not err in finding that BMC Belgium failed to negate all possible methods of establishing personal jurisdiction. Having overruled both of appellant's issues, we affirm the trial court's order.

HUDSON, Justice, dissenting.

BMC Software, Inc. (BMC), a Texas corporation, is in the business of developing, selling, and supporting computer software products. It also has many subsidiaries who are responsible for specific geographical sales and support around the world. One of those subsidiaries is BMC Software Belgium N.V. (BMCB). BMCB is a Belgian corporation, incorporated under Belgian law, which has at all times been based in Belgium. Because I do not believe BMCB's business relationship with BMC established the minimum contacts necessary to permit a Texas court to exercise general and/or specific personal jurisdiction over BMCB, I respectfully dissent.

The record reflects that in early 1996, Gerd Ordelheide, BMC's senior vice president of European operations, was searching for someone to manage the day-to-day operations of BMCB. In March, Ordelheide and Adri Kok, a director of BMCB, began negotiating with Michel Marchand, a Belgian citizen and an employee of Platinum Technology, a competing software company. Ordelheide and Kok represented to Marchand that one of the inducements for accepting employment with BMCB is that he would receive 20,000 share options of BMC stock. The offer of share options, however, was apparently conditioned upon the approval BMC's chairman and chief executive officer, Max Watson.

When Watson learned of the offer, he was concerned. Watson told Ordelheide that employees hired away from Platinum in the past had not proven to be very productive. Watson suggested that Ordelheide should be wary of hiring Marchand, but told Ordelheide that he must make the ultimate decision on whether to hire Marchand. Ordelheide ultimately offered the position to Marchand.

Rather than accepting the position in his individual capacity, Marchand proposed that BMCB contract directly with his management company, Procurement N.V. To obtain certain tax advantages, Marchand explained that he preferred to work as an independent contractor of Procurement. However, BMC's stock option plan was designed only for employees of BMC and its subsidiaries. Thus, Watson told Ordelheide that in order to qualify for the stock options, Marchand would have to be employed by BMCB, rather than as an independent contractor of Procurement.

Nevertheless, on June 13, 1996, a written agreement was executed between BMCB and Procurement. A little more than a year later, BMCB terminated the employment agreement due allegedly to poor performance. Marchand never received his stock options and he subsequently sued BMC and BMCB for breach of contract, fraud, and negligent misrepresentation.

When analyzing whether a defendant is subject to the general jurisdiction of the trial court, we are to view the evidence in the light most favorable to the trial court's decision. Here, the proof before the trial court showed that BMC's subsidiaries were responsible for the sales and support of the parent's software. Watson testified that the employees of BMC's subsidiaries were considered part of the parent's sales force. The proof also shows the subsidiaries gave BMC stock options to their employees as part of their compensation. Moreover, BMC's 1997 annual report includes the financial performance of its subsidiaries. Finally, Ordelheide had conversations with Watson, either in person or by telephone, regarding the hiring of Marchand.

BMCB obviously had a continuous and systematic business relationship with its

parent corporation. However, in my opinion, this fact does not necessarily establish the minimum contacts necessary to allow a Texas court to exercise general and/or specific personal jurisdiction over the subsidiary.

A parent corporation and its wholly owned subsidiary will necessarily have a business relationship. In some circumstances, a close relationship between a parent and its subsidiary may even justify a finding that one of the entities "does business" in a particular jurisdiction through the local activities of its parent or subsidiary. *See Jones v. Beech Aircraft Corp.*, 995 S.W.2d 767, 771 (Tex.App.—San Antonio 1999, pet. dism'd w.o.j.). However, courts must examine all relevant circumstances to determine whether the parent and subsidiary should be considered separate or joined. *See Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 720–21 (Tex.App.—Austin 2000, no pet. h.).

[A] variety of factors have guided courts in making this determination: whether distinct and adequately capitalized financial units are incorporated and maintained; whether daily operations of the two corporations are separate; whether formal barriers between the management of the two entities are erected, with each functioning in its own best interest; whether the two file consolidated tax returns; whether operating capital is financed by the parent or borrowed from other sources; whether the subsidiary's stock is owned by the parent; whether the two share common officers and directors; the extent to which separate books and accounts are kept; whether both have common departments of businesses; whether they have separate meetings of shareholders and directors; whether an officer or director of the one corporation is permitted to determine the policies of the other; whether those with

whom the corporation comes into contact are apprised of their separate identity; and the extent to which contracts between the parent and subsidiary favor one over the other.

*Id.* Thus, the mere fact that a court may have jurisdiction over the parent corporation does not automatically establish jurisdiction over its subsidiaries. *Cf. Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 125 (Tex.App.—Houston [1st Dist.] 2000, no pet. h.) (holding that normal business contacts between foreign parent and Texas-based subsidiary did not establish jurisdiction over the parent); *Jones*, 995 S.W.2d at 771 (holding the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent).

When deciding whether a forum parent is "doing business" through its foreign subsidiary or a forum subsidiary is "doing business" through its foreign parent, the analysis is akin to the same factors considered in determining whether one corporation is the alter ego of another—there must be something more than mere unity of financial interest, ownership and control. In other words, there must be a showing of control by the parent which is greater than normal or that the subsidiary acted as the alter ego of the parent. *See Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). Merely showing a blending of activities between the parent and subsidiary, such that they may have had some or all of the same directors or officers, filed consolidated income tax returns, shared the same corporate logo, conducted inter-corporate business, or officed in the same building, is not alone sufficient to establish alter ego. *See Trailways, Inc. v. Clark*, 794 S.W.2d 479, 489–90 (Tex.App.—Corpus Christi 1990, writ denied). Before alter ego jurisdiction

may attach, the court must determine that the parent so controls or dominates the subsidiary as to disregard corporate formalities. *See Conner v. ContiCarriers and Terminals,* 944 S.W.2d 405, 419 (Tex. App.—Houston [14th Dist.] 1997, no writ). Moreover, the Texas Supreme Court has cautioned that great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field. *See Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 229 (Tex. 1991).

While the record demonstrates that BMCB had a business relationship with its Texas-based parent, there is little, if any, evidence to show that these business relations were greater than those normally occurring between a parent and its subsidiary or that corporate formalities were disregarded. The record shows that BMCB, a Belgian corporation, incorporated under Belgium law, contracted with Procurement, a Belgian company, to manage its Belgian operations via an independent contractor who was, himself, a Belgian citizen. The contract expressly states that disputes are to be resolved according to Belgian law in a Belgian court. BMCB's tangential "contacts" with Texas appear to arise only through the familial business relationship that a subsidiary would normally be expected to have with its parent.

I would sustain BMCB's first and second points of error. Thus, I must respectfully dissent.