# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-02-00328-CV

**Charles Walker, Appellant**

**v.**

**Robert Loiseau, Special Deputy Receiver for American Benefit Plans, et al., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. GN201141, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is an appeal from the denial of a special appearance and the grant of a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2003);*Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Appellant Charles Walker, a Mississippi resident and president of First American Christian Society[1] ("the Fraternal"), conducted various business transactions with Robert Neal, a Texas resident and president of American Benefit Plans ("American Benefit"), regarding their respective insurance entities. In March 2002, the Attorney General of Texas brought suit against American Benefit and other entities owned or controlled by Neal

---

[1] First American Christian Society is referred to both as a "fraternal benefit society" and a "burial association" in the record. Under Mississippi law, a fraternal benefit society may provide a limited number of contractual benefits to its members, including: death, endowment, annuity, disability, and hospital benefits. *See* Miss. Code Ann. §§ 83-29-1, 83-29-9, 83-30-31 (2003). We will refer to First American Christian Society as "the Fraternal."

(collectively the "Neal entities"[2]) for engaging in the unauthorized business of insurance in Texas.[3] The Attorney General did not name Walker as a defendant. The trial court established a receivership to account for and recover American Benefit's various assets.[4] The Receiver then filed suit in Texas against Walker, Neal, and other defendants, ancillary to the main receivership suit involving the Neal entities, requesting a temporary injunction to freeze any assets held as a result of the Neal entities' activities. Walker challenged the Texas court's personal jurisdiction over him with regard to

---

[2] The entities for which Loiseau was appointed Special Deputy Receiver include: American Benefit Plans; United Employers Voluntary Employee Beneficiary Association; United Employers Voluntary Employee Beneficiary Association I; National Association for Working Americans; National Association of Working Americans; Robert David Neal, individually and d/b/a American Benefit Plans; United Employers Voluntary Employee Beneficiary Association; United Employers Voluntary Employee Beneficiary Association I; National Association of Working Americans, and National Association for Working Americans; and Robert Neal Pointer, individually and d/b/a Electronic Benefits Group, Inc., and d/b/a American Benefit Plans d/b/a Electronic Benefits Group, Inc.; Jose Michael Mangawang, individually and d/b/a National Association of/for Working Americans, and d/b/a Enhanced Health Management and American Benefit Plans; John Baptist Ramirez a/k/a Johnny Rhondo, individually, and The Four Corners Company, LLC, a/k/a Four Corners Co., LLC, a/k/a Four Corners Corp., a/k/a The 4 Corners Company, LLC.; American Association of Agriculture, Forestry and Fishing Workers; American Association of Transportation, Communication, Electrical, Gas and Sanitary Workers; American Association of Wholesale Trade Workers; American Association of Manufacturer Workers; American Association of Service Workers; American Association of Construction Workers; and the American Association of Professional Workers.

[3] The Receiver prevailed in the underlying lawsuit. *See Pointer v. State*, No. 03-02-00548-CV, 2003 Tex. App. LEXIS4611 (Austin May 30, 2003, no pet. h.) (memorandum opinion). Although Neal was represented by counsel and filed a notice of appeal, he took no further action and was dismissed as an appellant. *See Pointer v. State*, No. 03-02-00548-CV (Tex. App.—Austin March 5, 2003) (order).

[4] The Texas Department of Insurance was named Temporary Receiver for the defendants, and Robert Loiseau was designated Special Deputy Receiver. We will refer to them collectively as "the Receiver."

$500,000 transferred directly into his personal account. The district court denied Walker's special appearance and granted the temporary injunction.

**BACKGROUND**

In June 2001, Neal approached Walker with a proposal for the Fraternal to underwrite an American Benefit health-insurance plan. The two men met in Mississippi, and on July 12 Walker faxed a letter to Neal in Texas announcing an agreement whereby the Fraternal would serve as underwriter and would issue a master insurance policy to American Benefit. However, later in July, Walker faxed a second letter to Neal stating that any agreement between the two insurance entities was "terminated, effective immediately."[5] Walker terminated the agreement because Neal had made significant misrepresentations suggesting that the Fraternal insured all of American Benefit's health-care plans.[6]

However, in October or November, Walker contacted Neal to express an interest in marketing and selling American Benefit health-care plans in Mississippi. Walker signed in Mississippi, and sent to Neal in Texas, a "General Agent Agreement," provided by Neal, by which Walker agreed to market American Benefit plans in Mississippi. That contract included a choice-of-law and forum-selection clause providing that any disputes would be settled in Texas courts, under Texas law. Although Walker testified that he never received a copy signed by Neal, he did make at

---

[5] Much of Walker's correspondence is written in block capital letters. To make them more readable, any citation will be made using sentence-style capitalization.

[6] In his deposition, Walker described his discovery of Neal's misrepresentations: "[S]omeone called me and said that, and I said it's not true. I said, we have been talking, but I said, nothing had been signed." Walker then described his reaction: "I sent a letter, told [Neal] we was stopping all negotiations. Because this [] guy that called me."

least one sale under the agreement, although the transaction does not appear to have been consummated. During the same period, Walker and Neal negotiated to each buy a 25% share in Capitol Re, a reinsurance company they intended to use to reinsure the American Benefit health plans. That transaction also fell through.

Walker then decided to sell his interest in the Fraternal. It is the alleged sale of the Fraternal to Neal that forms the basis for the Receiver's suit against Walker to recover the $500,000. Walker faxed Neal indicating that he intended to sell his interest in the Fraternal and that, because Neal had previously expressed a desire to purchase control of the Fraternal, Walker would delay selling the company to another prospective buyer. The minutes from the Fraternal's January 10th meeting indicated that Walker was considering two different buyers and would have to pray on the decision. Minutes from the January 14th meeting indicate that Walker, acting alone, chose Neal.[7] In a subsequent fax, Walker indicated that he and Neal had reached an agreement on the sale: "Congratulations on agreeing to purchase the Walker family investment and contributions into [the Fraternal] and assuming control of [the Fraternal]."[8]

Although the only documentation of the transaction consists of these fax transmissions and the two excerpts from the minutes, Neal did in fact pay $500,000. Walker and his family members resigned their positions on the board of the Fraternal, simultaneously appointing

[7] Other correspondence in the record suggests that there were other potential buyers, but that record is underdeveloped and sketchy.

[8] The cover sheet to Walker's fax directed Neal to sign the letter and fax it back to Walker; there is no evidence in the record that Neal did so.

Neal and his associates to constitute the new board of directors.[9] Neal caused two $250,000 wire transfers to be sent by Electronic Benefits Group, a Neal entity, from a Texas bank to Walker's personal account in Tupelo, Mississippi. At the time of this transfer, the Fraternal's value appears from the record to have been significantly less than $500,000. The transfer was not memorialized, at Neal's request, in order to avoid making the transaction generally known.

In April, Walker received notice from the Mississippi Department of Insurance that the Fraternal was in violation of various capitalization requirements under the Mississippi insurance code and that the election of the new board had been illegal under a Mississippi law requiring that directors of Mississippi fraternal benefit societies be Mississippi residents. After asking Neal and the other newly installed board members to resign until they could establish Mississippi residence, Walker assumed the position of acting president. Walker's brief to this Court indicates that he is currently acting as president of the Fraternal.

In March, before Walker received the letter from the Mississippi Department of Insurance and while Neal was still in control of the Fraternal, the Texas Attorney General filed its original action alleging that Neal had engaged in money laundering by diverting insurance proceeds and premiums paid by Texas customers to various Neal entities. In that case, a forensic accountant traced some of those funds to offshore accounts, including some that had passed through the Fraternal.[10] Those funds allegedly passed from an entity known as the National Association for

---

[9] Minutes for the Fraternal's January 14 board meeting recorded the vote to appoint Neal and others to the board. At this time, Walker and the current members resigned; however, each would continue with their duties until Neal took control and responsibility.

[10] The record indicates that the offshore financial institutions that received the money alleged to have been transferred through the Fraternal have agreed to return it to the Receiver.

Working Americans, through Electronic Benefits Group, both of which were Neal entities, and after passing through the Fraternal were routed to offshore accounts on Neal's authority.[11]

The Receiver filed this suit against Neal, Walker, and others seeking to recover any funds wrongfully obtained from the Receivership estate. Initially, the Receiver pleaded the case under a conversion theory, requesting restitution of the wrongfully-taken funds. While the other defendants refused to testify, invoking their Fifth Amendment right against self-incrimination, Walker chose to file a special appearance challenging the Texas courts' jurisdiction over his person. In his response to the special appearance, the Receiver adjusted his position to argue that Walker had participated in tortious activities having an effect in Texas.

**The Hearing**

Both Walker's special appearance and the temporary injunction were heard in the same proceeding, without any prejudice to Walker's jurisdictional challenge. Walker did not appear. The Receiver based its argument for jurisdiction on the theory that Walker had participated in a money-laundering scheme masterminded by Neal and affecting Texas consumers. The Receiver began by taking the stand to testify about the underlying receivership proceedings and establish his case that the $500,000 transfer was part of a larger illegal scheme. The Receiver then called Tom Petrosewicz, a forensic accountant, to testify about the financial records of the Walker/Neal transactions. Petrosewicz testified that Neal's practice of transferring money between insurance

---

[11] According to Walker's deposition, he also had signature authority over the accounts in question at the time of the offshore transfers.

entities without receiving equivalent value in exchange was consistent with a pattern of money-laundering activity. Petrosewicz confirmed that all of the money transferred, either to Walker or to the Fraternal, had been taken from Texas insurance consumers. Despite close questioning by Walker's counsel, Petrosewicz maintained his position that Walker had sold Neal a worthless "interest" in the Fraternal in exchange for $500,000. The record contains no evidence t hat Walker had actual knowledge that the $500,000 was the fruit of an illegal scheme operated by Neal. There is also no evidence that the Fraternal was a link in Neal's alleged money laundering scheme while Walker was its president or a board member.

The Receiver introduced into evidence the various records of Walker's transactions with Neal and the Mississippi Department of Insurance's letter declaring that the Fraternal would be declared insolvent, absent remedial action, because it had included assets that did not belong to it and had drastically understated its debts and liabilities.[12] The letter also indicated that the mechanism by which Walker had transferred his interest to Neal, appointing the Neal family to sit on the board of directors, violated the Fraternal's bylaws and the requirement that all directors be Mississippi residents.[13] The Receiver argued that, because of this indication that the Fraternal had not been worth the money Neal paid to Walker and because of the suggestion that the Fraternal was legally incapable of benefitting Neal's insurance organization, Walker had participated in Neal's tortious behavior.

---

[12] In its letter, the Mississippi Department of Insurance indicated that the Fraternal had misrepresented the value of its assets and the extent of its debts on its required capitalization filings.

[13] Walker testified in his deposition that he believed that Neal and some of his family members intended to relocate to Mississippi.

In response, Walker's counsel relied on Walker's deposition testimony explaining his relationship with Neal. Walker argued that, because he could offer a plausible explanation for his business transactions with Neal, it was impossible for the Texas courts to exercise jurisdiction based only on the communications regarding the $500,000 in transferred funds. Walker argued that he had merely sold his interest in the Fraternal to Neal in a *bona fide* transaction, taking place entirely in Mississippi, and that any legal irregularities were the result of oversight on his part.

Because Walker did not take the stand, the Receiver introduced and tendered all of Walker's deposition into evidence. Walker had difficulty explaining the transaction. When asked to describe the nature of the property he had conveyed to Neal in return for $500,000, Walker claimed that he had transferred his and his family's "interest" in the Fraternal. However, under questioning, Walker admitted that he did not actually own an interest in the Fraternal. Rather, the Fraternal belongs to its members, not to the individuals managing the Fraternal's activities. Walker freely admitted that he had no direct ownership interest in the Fraternal, but rather held a "management contract" whereby he was to recover 5% of the Fraternal's profits. However, under examination, Walker admitted that the Fraternal had never made a profit and that he had never been paid any money pursuant to his management contract. Walker then suggested that he had transferred to Neal a "controlling interest" in the Fraternal. However, Walker also admitted that he had attempted to transfer control over the fraternal to Neal in contravention of the Fraternal's bylaws. Although under the by-laws only the membership may elect the board of directors, Walker and his family attempted to transfer a controlling interest in the Fraternal by resigning and *appointing* a successor board composed of Neal and his relatives. Walker further admitted that he knew it was

8

inappropriate for non-Mississippi residents to sit on the board of a Mississippi fraternal organization, but maintained that he believed that the Neals intended to move to Mississippi and had looked into buying real estate in the area.

Walker claimed that the value of this management contract and control of the board of directors was $500,000. This amount, Walker claimed, constituted the amount of money he had personally invested in the Fraternal while acting as its manager. However, under examination, Walker admitted that there existed no documentation of any debt owed by the Fraternal to Walker. Walker claimed that his wife, who served as the Fraternal's bookkeeper, knew of the investments but had not entered them into the Fraternal's accounting records. Walker admitted that the required capital disclosure forms, which were filed over his signature with the Mississippi Department of Insurance, contained no record of the alleged $500,000 investment. Walker also contended that the Fraternal had value to Neal because it provided an opportunity for Neal's insurance entities to sell insurance products in other states, because Neal had been having some regulatory problems in Texas.[14] Walker testified that Neal would be able to market insurance products outside of Mississippi if Neal provided the Fraternal with sufficient capitalization to meet other states' regulatory capitalization requirements. Although Walker offered no evidence supporting his allegation that ownership of the Fraternal would assist Neal in marketing insurance products in "other states," the letter from the Mississippi Department of Insurance indicates that "[the

---

[14] Walker admits that he ultimately learned that Neal had been indicted for his activities in Texas, but claims that he only learned of the charges after his dealings with Neal had been concluded.

Fraternal's] license only gives it the authority to offer certain benefits to *Mississippi residents*."[15] (Emphasis added). Walker could give no other explanation for any value conveyed to Neal in return for $500,000.

Walker and the Receiver agreed on the basic details of Walker's business relationship with Neal, but joined issue as to whether Walker had participated in Neal's money-laundering activities. The Receiver contended that, because Walker's actions were part of a pattern of fraudulent activity, undertaken in the context of an ongoing business relationship involving Texas insurance entities, personal jurisdiction was appropriate based on the harm which occurred in Texas. Walker countered the Receiver's assertion of jurisdiction by attempting to provide an innocent interpretation of each aspect of the purported sale of the Fraternal. The trial court denied Walker's special appearance and granted the temporary injunction. Walker now appeals.

## DISCUSSION

**Special Appearance**

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). Once the plaintiff meets that burden, the burden shifts to the defendant to negate all jurisdictional bases. *Id.*; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985). Whether a court has personal jurisdiction over a

---

[15] We make no conclusion as to the ultimate legality of Walker's actions under Mississippi law. The representations of the Mississippi Department of Insurance merely serve to rebut Walker's position that he participated in a good faith transaction.

defendant is a question of law. *BMC Software*, 83 S.W.3d at 794. However, the trial court frequently must resolve questions of fact before deciding the jurisdictional question. *Id.*; *see also Pessina v. Rosson*, 77 S.W.3d 293, 296 (Tex. App.—Austin 2001, pet. dism'd w.o.j.) (review of special appearance on agreed facts: *de novo*). If a trial court enters an order denying a special appearance and issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *BMC Software*, 83 S.W.3d at 794. We determine the appropriateness of the trial court's resolution of a fact dispute by an ordinary sufficiency of the evidence review based on the entire record of the special appearance proceeding. *Daimler-Benz Aktiengellschaft v. Olson*, 21 S.W.3d 707, 715 (Tex. App.—Austin 2000, no pet.).

A Texas court may exercise jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991); *see* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997). The broad language of the long-arm statute permits an expansive reach, limited only by the federal constitutional requirements of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). Therefore, our task is to determine whether the trial court's exercise of jurisdiction over Walker violates federal due process standards. *Guardian Royal*, 815 S.W.2d at 226. The federal due process clause protects a person's liberty interest in not being subject to binding judgments of a forum with which that person is not sufficiently connected. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985). A state may assert personal jurisdiction over a nonresident defendant only if the defendant has (1) maintained minimum contacts with the forum state and (2) the exercise

11

of jurisdiction comports with traditional notions of fair play and substantial justice. *BMC Software*, 83 S.W.3d at 792. A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts to confer personal jurisdiction. *Id.* at 795 (citing *Burger King*, 471 U.S. at 474-76). Harmful activities that will foreseeably cause harm in the foreign state *are* generally sufficient to invoke personal jurisdiction. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296-97 (manufacturer and importer subject to Oklahoma jurisdiction in automobile products-liability suit, but not New York based importer and dealer). Furthermore, intentional tortious activity confers general jurisdiction at the situs of the harm caused. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (libel jurisdiction appropriate in any state where libelous statements published).

### Minimum Contacts

Walker argues that specific personal jurisdiction is inappropriate in this case because his legitimate business contacts with the State of Texas regarding the transferred money were insufficient to constitute minimum contacts.[16] His argument, however, is based on case law involving business transactions rather than patterns of tortious activity. *See, e.g.*, *3-D Elec. Co. v.*

---

[16] The minimum contacts analysis has been refined into two categories—general and specific. Specific jurisdiction exists when the cause of action arises out of or relates to the nonresident's actions that give rise to the court's jurisdiction. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 (Tex. 1991). General jurisdiction exists when the defendant's contacts with the forum state are sufficiently continuous and systematic that there exists personal jurisdiction for any suit against the defendant to be brought in that state. *Id.* Because general jurisdiction has wider scope, the standard is more demanding, requiring a showing of substantial activities within the forum state. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). The Receiver has not argued that Walker is subject to general jurisdiction.

12

*Barnett Constr. Co.*, 706 S.W.2d 135, 137 (Tex. App.—Dallas 1986, writ ref'd) (Tennessee general contractor not subject to jurisdiction based on casual contact with sub-contractor doing business in Texas). The long-arm statute allows personal jurisdiction for any tort "committed in whole or in part in Texas." Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2). In Texas, personal jurisdiction may be appropriate in cases where a defendant takes part in any aspect of a tortious scheme that impacts Texas citizens, regardless of a defendant's other links to our State. *See Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437, 438 n.5 (Tex. 1982); *see also Memorial Hosp. Sys. v. Fisher Ins.*, 835 S.W.2d 645, 650-51 (Tex. App.—Houston [14th Dist.] 1992, no writ) (commission of tort causing foreseeable economic injury in Texas sufficient to confer personal jurisdiction); *General Elec. v. Brown & Ross Int'l.*, 804 S.W.2d 527, 532 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (fraud conspirator subject to specific personal jurisdiction in Texas because, in participating in fraud scheme, could have anticipated subsequent litigation). At the special appearance hearing, the Receiver argued that personal jurisdiction was appropriate because Walker had participated in Neal's scheme, much of which unfolded in Texas. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2). Because participation in tortious activity is sufficient to confer specific personal jurisdiction under both the long-arm statute and the federal due process clause, we will affirm the trial court's ruling if the evidence presented at the hearing is legally and factually sufficient to support the trial court's determination. *See Olson*, 21 S.W.3d at 715.

When, as in this case, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence in the record are implied in favor of the denial. *BMC Software*, 83 S.W.3d at 795.

13

Because the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.* In the case at bar, however, the trial court's findings of fact pursuant to the temporary injunction, which were based on the same record as the special appearance, are instructive in assessing the trial court's ruling on the special appearance. The Receiver bore a higher burden in the temporary injunction proceeding; an element of the pleadings for obtaining a temporary injunction is the requirement that the movant demonstrate a right to probable recovery. *Transport Co. of Tex. v. Robertson Transps., Inc.*, 261 S.W.2d 549, 552 (Tex. 1953); *Amalgamated Acme Affiliates, Inc. v. Morton*, 33 S.W.3d 387, 392 (Tex. App.—Austin 2000, no pet.). The trial court's finding indicates that the court considered there to be sufficient evidence for the proposition that the Receiver would recover funds from Walker and the other defendants because Walker and the others were *participants* in Neal's overall scheme. In order to issue the temporary injunction, the trial court evaluated the credibility of Walker's testimony before ruling against him. We believe that this finding bolsters the trial court's denial of Walker's special appearance.

We review the special appearance record under the same standard applied to the review of jury findings or a trial court's findings of fact. *See BMC Software*, 82 S.W.3d at 795 (citing *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989)). Walker bore the burden of disproving all bases for jurisdiction. In its role as fact-finder, the trial court is the sole arbiter of the witnesses' credibility and the weight to be given their testimony. *See Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744-45 (Tex. 1986). It is not within the province of this Court to interfere with the trial court's resolution of conflicts in the evidence or to pass on the weight or

14

credibility of the witnesses' testimony. *See Benoit v. Wilson*, 239 S.W.2d 792, 796 (Tex. 1951); *K-Mart Corp. v. Pearson*, 818 S.W.2d 410, 413 (Tex. App.—Houston [1st Dist.] 1991, no writ). Even when there is conflicting evidence, the fact-finder's verdict on such matters is generally regarded as conclusive. *See Schneider v. Schneider*, 5 S.W.3d 925, 930 (Tex. App.—Austin 1999, no pet.).

The record contains sufficient evidence to suggest that Walker participated in a scheme of tortious activity affecting Texas consumers. Petrosewicz described the overall *modus operandi* of Neal's money-laundering activities: to transfer money between insurance entities without any equivalent value being conferred or recorded in the accounting records.[17] Petrosewicz testified that, as in the other instances of money transferring, the money transferred to Walker had been given for little or no actual benefit. The "interest" in the Fraternal transferred to Neal by Walker involved an almost insolvent fraternal benefit organization. There were no documents memorializing the transaction. More importantly, the transfer was facially illegal because it involved the selection by the former board of directors of a new board of directors and involved the transfer of seats on a board of directors of a Mississippi fraternal benefits organization to non-Mississippi residents, in contravention of state law.[18] Furthermore, the $500,000, which Walker characterized as the value of his investment in the Fraternal, was not be accounted for in the Fraternal's accounting records, which were kept by Walker's wife.

---

[17] Under Texas law, knowingly acquiring an interest in the proceeds of criminal activity may constitute money laundering. See Tex. Pen. Code Ann. § 34.02(a)(1) (West 2003).

[18] Walker in his deposition admitted that according to the Fraternal's by-laws the board of directors could only be elected by a vote of the membership; nevertheless, Walker and his family members attempted to appoint the new board without consulting the Fraternal's members.

15

The purpose of a special appearance is not to determine liability, but whether the actions alleged by a plaintiff are of a type that suggest a defendant should expect to be subject to Texas jurisdiction. *See Mort Keshin & Co. v. Houston Chronicle Publ'g Co.*, 992 S.W.2d 642, 648 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Walker's activities must also be evaluated in the context of his business relationship with Neal, which makes clear that Walker understood that he was dealing with money owned by Texas-based insurance entities. At one point, Walker even signed an agency agreement with a forum-selection clause providing for Texas jurisdiction. These contacts to some degree rebut Walker's assertion that he was unaware that his business dealings with Neal could potentially make him amenable to personal jurisdiction in Texas. Taken together, the evidence introduced by the Receiver was legally sufficient to support a finding that Walker had participated in Neal's money-laundering activities and was therefore subject to personal jurisdiction in Texas. *See Pessina*, 77 S.W.3d at 296 (participation in fraudulent insurance scheme conferred personal jurisdiction).

To determine the factual sufficiency of the denial of the special appearance, we must look to the record as a whole. The only direct evidence to contradict the Receiver's version of Walker's transaction with Neal is Walker's deposition testimony, entered into evidence by the Receiver. Walker claimed that he was an innocent seller in good faith and that any legal irregularities involved in the sale were the result of his ignorance of the law. In essence, Walker's deposition corroborates the details of the Receiver's version of events; Walker simply offers an innocent explanation for each aspect of the transaction. The trier of fact was, in effect, presented with two contradictory explanations of Walker's business relationship with Neal. As is apparent

16

from the denial of the special appearance and the finding that, for purposes of the temporary injunction, all of the defendants had likely been participants in Neal's illegal schemes, the trial court found Petrosewicz's explanation of the documentary evidence more credible than Walker's explanation.[19] We will not disturb the trial court's determination of the credibility of equally relevant testimony describing two theories of the case. *See Gutierrez v. Deloitte & Touche*, 100 S.W.3d 261, 273 (Tex. App.—San Antonio 2002, pet. filed) (specific jurisdiction appropriate in fraud case where defendant presented testimony on, but did not negate, all jurisdictional bases).

A nonresident defendant is subject to personal jurisdiction for activities that could foreseeably cause injury in the forum state. The evidence is sufficient to support a finding that, in all probability, Walker participated in a scheme that caused harm to Texas insurance consumers. Walker's participation in Neal's overall pattern of fraudulent activity satisfies the minimum-contacts requirement of the required personal jurisdiction analysis.

### Traditional Notions of Fair Play and Substantial Justice

Even though minimum contacts are established, personal jurisdiction may still be inappropriate if it violates traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S.102, 114 (1987); *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex. 1996). The courts look to five factors in making this determination: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most

---

[19] By not testifying, Walker may have disadvantaged himself in the credibility contest.

17

efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal*, 815 S.W.2d at 232.

Walker has at no time proffered evidence of his inability to litigate fully and fairly in Texas. In fact, the record indicates that Walker agreed to be, and was, deposed in Austin, Texas. Although there may be an argument that Walker would be inconvenienced by litigating this claim in Texas based solely on geographic proximity, such concerns are greatly mitigated in this case by the nature of the underlying suit and the need of the Receiver to maintain an efficient trial in order to preserve the Receivership's assets. We are reluctant to hold that personal jurisdiction is inappropriate simply because a defendant has been shown to be a resident of another state. Many of the primary witnesses in this case, including the defendants in the underlying Receivership action, are Texas residents. Furthermore, we believe that jurisdiction is appropriate in light of Texas's overwhelming regulatory concern and the interest in efficient interstate enforcement of justice. Given the scope of the fraud allegedly perpetrated by the Neal entities, it would be wasteful of judicial resources to conduct parallel litigation of this ancillary issue to the underlying Receivership action in Mississippi. We overrule Walker's first issue.

**Temporary Injunction**

Walker's only issue regarding the temporary injunction is his argument that the court lacked personal jurisdiction. Because we find that the trial court properly denied Walker's special appearance, we overrule his second issue.

**CONCLUSION**

Because the evidence supports the implied finding that Walker participated in tortious conduct having effects in Texas, we affirm the trial court's denial of Walker's special appearance and the temporary injunction as entered.

_____

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   July 24, 2003

19