

# NUMBER 13-17-00134-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GRUPO MEXICO S.A.B. DE C.V.,                                    Appellant,

v.

MT. MCKINLEY INSURANCE COMPANY AND
EVEREST REINSURANCE COMPANY,                          Appellees.

### On appeal from the 319th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Longoria, and Perkes
### Memorandum Opinion by Justice Perkes

We issued a memorandum opinion and judgment in this case on December 19, 2019. Appellant Grupo Mexico S.A.B. de C.V. (Grupo) filed motions for rehearing and en banc reconsideration. Without changing our previous disposition, we deny the motions, withdraw our December 19, 2019 memorandum opinion and judgment, and issue this

substitute memorandum opinion and its accompanying judgment in their place.

Appellees Mt. McKinley Insurance Company and Everest Reinsurance Company (collectively Mt. McKinley) filed suit in Texas against Grupo, a foreign corporation, and two of its subsidiaries, Americas Mining Corporation (AMC) and Asarco, Inc., also foreign corporations. In this interlocutory appeal, Grupo contends the trial court erred in denying its special appearance because: (1) the trial court lacks general jurisdiction over Grupo; (2) the trial court lacks specific jurisdiction over Grupo based on Grupo's contacts; (3) the contacts of Grupo's subsidiaries cannot be imputed to Grupo under an alter ego theory; and (4) Mt. McKinley's motion to strike Grupo's special appearance was not an otherwise legitimate basis to deny Grupo's special appearance. We affirm.

## I. BACKGROUND[1]

In 1999, Grupo, an international mining concern based in Mexico City, acquired Asarco, LLC[2] (Asarco) in a leveraged buyout and subsequently formed AMC as a wholly-owned subsidiary to hold its shares of Asarco. Asarco, incorporated in New Jersey and headquartered in Arizona, had been involved in the mining industry, both domestically and internationally, for over a century. However, due to a confluence of factors, including increased debt load after the leveraged buyout, falling copper prices, and mounting environmental and asbestos liabilities,[3] Asarco found itself unable to pay its debts after

---

[1] For a detailed background, see *Asarco, LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008).

[2] Asarco, LLC is a separate and distinct entity from Asacro, Inc., and is not a party to this litigation.

[3] "ASARCO and its subsidiaries were defendants in over 6,000 lawsuits with over 25,000 plaintiffs." *Asarco, LLC*, 396 B.R. at 373.

2

Grupo's acquisition, including invoices from vendors critical to Asarco's daily operations.

The exception to Asarco's debt crisis was its controlling interest in the publicly traded Southern Peru Copper Company (SPCC), which remained profitable in the face of low copper prices and contributed significantly to Asarco's operating cash flow. [4] Recognizing SPCC's value and its vulnerability to Asarco's creditors, Grupo sought to transfer Asarco's shares in SPCC to AMC (the "SPCC Transfer"). Grupo was concerned that the SPCC Transfer might be challenged in court as a fraudulent transfer by Asarco's creditors, so it hired outside accounting and law firms to shepherd the deal.

Inbursa, a banking company in Mexico, agreed to loan AMC $310 million to fund a portion of the transaction; however, as a condition of the financing, Asarco was required to use a portion of the proceeds from the SPCC Transfer to pay $100 million in unsecured Yankee Bonds owned by Inbursa. But Asarco needed to raise an additional $50 million to pay off the Yankee Bonds, and thus began monetizing assets. This included filing a lawsuit against Mt. McKinley and other insurers in Nueces County, Texas, seeking payment under insurance policies for asbestos claims made against Asarco ("Coverage Lawsuit"). Grupo was not a party to that litigation. On March 20, 2003, Asarco and Mt. McKinley entered into a "Settlement Agreement, Release and Policy Buy–Back" whereby Mt. McKinley agreed to pay $12 million in exchange for Asarco's release of all claims against it and the voiding of the insurance policy ("Settlement Agreement"). Under the Settlement Agreement, Asarco agreed to defend and indemnify Mt. McKinley from any claims arising from the settlement. "Asarco" was defined under the Settlement Agreement

---

[4] "Between 1999 and 2002, SPCC contributed $650 million to ASARCO's operating cash flow, and without the stock, ASRCO would have had a negative cash flow." *Asarco, LLC*, 396 B.R. at 374.

to include Grupo.

The SPCC Transfer was completed eleven days later. The structure of the deal allowed Asarco to retire a significant amount of debt, including a $450 million line of revolving credit secured by Grupo, but left Asarco with less cash on hand than before the transfer, and without its most valuable cash-generating asset.

In 2005, Asarco and several of its wholly owned subsidiaries filed for bankruptcy. Two years later, Asarco initiated an adversary proceeding against Mt. McKinley, seeking to avoid the Settlement Agreement as a constructive fraudulent transfer. *See* 11 U.S.C. § 548 (stating that the bankruptcy trustee "may avoid any transfer . . . of an interest of the debtor in property . . . if the debtor . . . received less than a reasonably equivalent value in exchange for such transfer . . . and . . . was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer"). Mt. McKinley demanded that Grupo defend and indemnify it in the adversary proceeding under the terms of the Settlement Agreement. When Grupo refused, Mt. McKinley filed the underlying suit in Nueces County, Texas against Grupo, Asarco, Inc., and AMC, seeking a declaratory judgment of Grupo's obligations under the Settlement Agreement and damages for the amount it incurred in connection with the adversary proceeding.[5]

AMC and Asarco, Inc. made general appearances, but Grupo filed a special appearance, challenging Mt. McKinley's allegations of general and specific jurisdiction.

---

[5] According to Mt. McKinley, Asarco, Inc. was "formed by Grupo after 1999 as a holding company for Asarco . . . ." Grupo suggests that Mt. McKinley brought its claims against the parties in this suit because it was precluded from asserting its claims against Asarco during Asarco's Chapter 11 bankruptcy proceedings.

*See* TEX. R. CIV. P. 120a. Mt. McKinley alleged that Asarco's Texas contacts could be imputed to Grupo under an alter ego theory for purposes of establishing both general and specific jurisdiction. Mt. McKinley additionally alleged that Grupo's own contacts with Texas were sufficient to establish specific jurisdiction.

The trial court initially granted Grupo's special appearance and Mt. McKinley filed an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7); *Mt. McKinley Ins. Co. v. Grupo Mexico, S.A.B. de C.V.* (*Grupo I*), No. 13-12-00347-CV, 2013 WL 1683641 (Tex. App.—Corpus Christi–Edinburg Apr. 18, 2013, no pet.) (mem. op.). Based on the record before us, we determined that the trial court did not err in granting the special appearance. *Grupo I*, 2013 WL 1683641, at *7. We reversed and remanded, however, to allow for additional jurisdictional discovery. *Id.* at *11. We concluded that the trial court abused its discretion by denying Mt. McKinley's motion for a continuance because Grupo had repeatedly obstructed Mt. McKinley's efforts to obtain even the most basic jurisdictional discovery. *Id.* at *10.

On remand, despite protracted discovery disputes, a voluminous jurisdictional record was ultimately produced.[6] Upon reurging, the trial court denied Grupo's special appearance and now Grupo seeks interlocutory review of that decision. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

---

[6] A significant portion of the discovery produced on remand arises from another adversary proceeding during Asarco's bankruptcy in which Asarco sought to avoid the SPCC Transfer as a fraudulent conveyance. *See generally Asarco, LLC*, 396 B.R. 278. After a four-week bench trial, United States District Judge Andrew S. Hanen handed down a 166-page opinion in which he ultimately concluded that the SPCC Transfer constituted an actual fraudulent conveyance. *Id.* at 394. As we will explain below, many of Judge Hanen's findings and conclusions have no bearing on our jurisdictional analysis in this case. Nevertheless, the proceeding produced copious amounts of evidence that Mt. McKinley now relies upon to support its jurisdictional allegations.

## II.  STANDARD OF REVIEW & APPLICABLE LAW

### A.      Standard of Review

Whether a trial court may exercise personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002)). The plaintiff bears the initial burden of alleging facts that establish the trial court's jurisdiction. *Id.* (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009)). The burden then shifts to the defendant to negate all bases for personal jurisdiction that exist in the plaintiff's pleading. *Id.* (citing *Republic Drilling*, 278 S.W.3d at 337). "When, as here, the trial court did not issue findings of fact and conclusions of law, all relevant facts that are necessary to support the judgment and supported by evidence are implied." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

### B.      Personal Jurisdiction

Under Texas's long-arm statute, Texas courts may exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041, .042; *PHC-Minden, L.P., v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007). Because the exercise of personal jurisdiction over a nonresident implicates due process concerns, the Texas long-arm statute reaches only "as far as the federal constitutional requirements of due process will permit." *PHC-Minden*, 235 S.W.3d at 166 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)); *see*

*Goodyear Dunlop Tires Operations, S.A., v. Brown*, 564 U.S. 915, 918 (2011) ("A state court's assertion of jurisdiction exposes defendants to the State's coercive power, and is therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))). Accordingly, in addition to its own decisions, the Supreme Court of Texas relies on precedent from the United States Supreme Court and other federal courts. *PHC-Minden*, 235 S.W.3d at 166.

The exercise of personal jurisdiction satisfies due process if (1) the nonresident defendant established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe*, 326 U.S. at 316). When a corporate, nonresident defendant purposefully avails itself of the privileges and benefits of conducting business in a foreign jurisdiction, its contacts are sufficient to confer the forum with personal jurisdiction. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) (citing *Republic Drilling*, 278 S.W.3d at 338)). Only the defendant's purposeful contacts are relevant to the inquiry, unilateral activity of another party or third person, as well as random, isolated, or fortuitous contacts by the defendant, are insufficient to prove the defendant purposefully availed itself. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, LP*, 493 S.W.3d 65, 70 (Tex. 2016) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

Once minimum contacts have been established, the exercise of jurisdiction will typically comport with traditional notions of fair play and substantial justice. *Spir Star AG*

7

*v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, PLC*, 815 S.W.2d 223, 231 (Tex. 1991)). The defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231). Those considerations include: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Id.* at 878 (quoting *Guardian Royal*, 815 S.W.2d at 231).

There are two types of personal jurisdiction, specific and general. *Id.* at 71; s*ee generally Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (adopting the terms "general" and "specific" to describe the two types of personal jurisdiction). Specific jurisdiction is appropriate when the plaintiff's claim arises from or relates to the defendant's contacts with the forum state. *Cornerstone Healthcare*, 493 S.W.3d at 71 (citing *Spir Star*, 310 S.W.3d at 873). Thus, the central inquiry under specific jurisdiction is the relationship between the defendant, the forum state, and the plaintiff's claim. *Id.* at 71 (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007)).

General jurisdiction, on the other hand, does not require a nexus between the defendant's in-state contacts and the plaintiff's claim; instead, the focus is solely on the defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414 (citing *Perkins v.*

8

*Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)); *PHC-Minden*, 235 S.W.3d at 168. Without that connection, however, traditional notions of fair play and substantial justice become tenuous; therefore, to counterbalance that tension, our supreme court has long recognized that general jurisdiction requires "a more demanding minimum contacts analysis than for specific jurisdiction," describing the necessary contacts with Texas as "continuous and systematic" or "substantial activities." *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996) (citations omitted).

Until recently, the United States Supreme Court had "given little guidance on the appropriate inquiry for general jurisdiction." *PHC-Minden*, 235 S.W.3d at 167. Then, in *Goodyear Dunlop Tires Operations, S.A., v. Brown*, the Court confirmed that general jurisdiction imposes a substantially higher standard than specific jurisdiction, requiring the defendant's contacts with the forum to be so pervasive and constant "as to render [the defendant] essentially at home in the forum state." 564 U.S. 915, 919 (2011). In other words, to establish general jurisdiction over an out-of-state corporate defendant, the defendant's in-state activities must be equivalent to the defendant incorporating or establishing a principal place of business in the forum. *Id.* at 924.

A few years later, in *Daimler AG v. Bauman*, the Supreme Court expounded on what it means to be "essentially at home" by specifically rejecting the idea that maintaining a "substantial, continuous, and systematic course of business" in the forum is sufficient to confer general jurisdiction. 571 U.S. 117, 138 (2014); *Old Republic*, 549 S.W.3d at 565 (recognizing "essentially at home" as the new standard for general jurisdiction). Although it declined to foreclose the possibility that a forum could exercise general jurisdiction over

an out-of-state corporate defendant, the Court acknowledged that it would require "an exceptional case." *Daimler*, 571 U.S. at 139 n.19.

### III. ANALYSIS

### A. General Jurisdiction

By its first issue, Grupo contends that the trial court's denial of its special appearance cannot be sustained on Mt. McKinley's allegations of general jurisdiction because they are legally insufficient under *Daimler* to meet the "essentially at home" standard. *See* 571 U.S. at 138; *Goodyear*, 564 U.S. at 919; *Old Republic*, 549 S.W.3d at 565. Mt. McKinley imputes Asarco's contacts to Grupo under an alter ego theory to establish the trial court's general jurisdiction over Grupo. It also points to Asarco, Inc. and AMC's general appearances and our previous comment in *Grupo I* that "[i]t is undisputed that Asarco and AMC have continuous and systematic contacts with Texas such that the exercise of general jurisdiction over those entities is proper." 2013 WL 1683641 at *5. Mt. McKinley reasons that if the trial court has general jurisdiction over Asarco, Inc. and AMC, and their contacts are imputed to Grupo under an alter ego theory, then the trial court necessarily has general jurisdiction over Grupo. We disagree. Even if we assume that all of Asarco, Inc., Asarco, and AMC's in-state contacts can be imputed to Grupo, Mt. McKinley failed to satisfy its initial burden to plead sufficient facts that demonstrate Grupo, a foreign corporation with acknowledged holdings across the United States, Mexico, and Peru, was nonetheless "essentially at home" in Texas. *See Daimler*, 571 U.S. at 138; *Goodyear*, 564 U.S. at 919; *Old Republic*, 549 S.W.3d at 565.

Mt. McKinley fails to recognize that *Daimler's* new general jurisdiction inquiry "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." 571 U.S. at 139 n.20. Like this case, the plaintiff in *Daimler* attempted to impute the in-state contacts of a foreign subsidiary to a foreign parent corporation. *Id.* at 122–23. Thus, under *Daimler*, whether a subsidiary's imputed contacts render the parent corporation "essentially at home" in the forum state must be viewed within the larger context of the parent's entire business operations. *See id.* at 139 n.20.

The Supreme Court recently applied this principal in *BNSF Ry Co. v. Tyrrell*, holding that Montana did not have general jurisdiction over a foreign railroad company that "has over 2,000 miles of railroad track and employs more than 2,000 workers in Montana." 137 S.Ct. 1549, 1554, 1558–59 (2017). The Court concluded that these contacts were insufficient to render the railroad company "essentially at home" in Montana because they represented a small fraction of its overall operations across twenty-eight states. *Id.*

In this case, Mt. McKinley alleges that Asarco, a foreign corporation, has owned and operated the "Amarillo Copper Refinery for the past 40-plus years" and "mined or refined metals in Texas for more than 90 years."[7] Even if we assume that these contacts would be sufficient to confer Texas with general jurisdiction over Asarco—a conclusion that seems improbable in light of *Daimler*—Mt. McKinley also acknowledges in its petition that Grupo "operates large mining complexes" in Mexico, Peru, and "several locations" across the United States, all while holding itself out as "one of the major copper producers

---

[7] Although Mt. McKinley urges us to also impute Asarco, Inc. and AMC's in-state contacts for purposes of general jurisdiction, it failed to identify any such contacts in its petition.

11

in the world." Thus, Asarco's refinery in Amarillo represents a fraction of Grupo's overall mining operations, which, according to Mt. McKinley's petition, span three different countries, including multiple jurisdictions in the United States. As *Daimler* instructs, and *BNSF* reaffirms, "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler,* 571 U.S. at 139 n.20; *BNSF*, 137 S.Ct. at 1559.

Further, merely engaging in a substantial, continuous, and systematic course of business in the forum is no longer sufficient to confer general jurisdiction. *Daimler,* 571 U.S. at 138. As the *Goodyear* Court explained, a corporation's affiliations with the forum must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." 564 U.S. at 919 (quoting *Int'l Shoe*, 326 U.S. at 317). Although it has not had the occasion to affirmatively define the contours of the "essentially at home" standard, the Supreme Court has pointed to *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) as the singular example of an "exceptional case" where a foreign corporation was "essentially at home" in the forum state. *Daimler*, 571 U.S. at 139 n.19; *Goodyear*, 564 U.S. at 925.

In *Perkins*, a Philippine mining corporation was sued in Ohio, where the corporation's president and general manager relocated and maintained the corporate office after the Japanese occupied the Philippines during World War II. 342 U.S. at 447–48. During this extended period, the president "carried on in Ohio a continuous and systematic supervision" of the corporation's business affairs, "discharg[ing] his duties as president and general manager" from his Ohio office. *Id.* at 448. As the Court would later explain, Ohio's exercise of general jurisdiction was permissible because "Ohio was the

12

corporation's principal, if temporary, place of business." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 n.11 (1984).

In this case, Mt. McKinley acknowledges in its petition that Grupo "is a Mexican corporation with its principal place of business in Mexico." Mt. McKinley has never alleged that Grupo maintains an office in Texas, let alone a de facto corporate office where it manages all of its business affairs. *See Perkins*, 342 U.S. at 447–48. To the contrary, Mt. McKinley alleges that all of Grupo's affairs, including those of its subsidiaries, are managed and controlled by German Larrea and Grupo's Corporate Finance Committee— from Mexico.

Therefore, not only are Mt. McKinley's allegations insufficient to meet its initial burden, without more, these allegations effectively negate the trial court's general jurisdiction. Grupo cannot be "essentially at home" in every foreign jurisdiction where it operates, and Mt. McKinley has failed to allege any facts distinguishing Asarco's Amarillo refinery from Grupo's significant operations across several foreign jurisdictions, all of which are allegedly controlled from Mexico, not Texas. *See BNSF*, 137 S.Ct. at 1554, 1558–59; *Daimler*, 571 U.S. at 139 & n.20; *Goodyear*, 564 U.S. at 919; *Perkins*, 342 U.S. at 447–48. In sum, even if we impute all of Asarco's Texas contacts to Grupo, this case is far from "exceptional" for purposes of general jurisdiction.[8] *See Daimler*, 571 U.S. at 139 n.19. We sustain Grupo's first issue.

---

[8] Mt. McKinley also alleges that Grupo itself: (1) participated in Asarco's bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of Texas; (2) guaranteed lease payments for the use of a Texas rail line by one of its subsidiaries; (3) instituted a lawsuit in a Dallas federal court; and (4) maintained several bank accounts in Texas. These additional Texas contacts, even in combination with Asarco's in-state contacts, fall well short of the "essentially at home" standard. *See BNSF Ry Co. v. Tyrrell, 137 S.Ct. 1549, 1554, 1558–59 (2017); Daimler AG v. Bauman*, 571 U.S. 117, 139 & n.20 (2014); *Goodyear*

13

**B.        Whether Grupo's Contacts with Texas Establish Specific Jurisdiction**

Mt. McKinley also alleges that the trial court has specific jurisdiction over Grupo because Grupo was a party to the Settlement Agreement, which resolved a Texas lawsuit and gave rise to Mt. McKinley's claims in this case. We previously held in *Grupo I* that even if we assumed that Grupo was a party to the Settlement Agreement, that disputed fact would be insufficient to confer the trial court with specific jurisdiction because, although it resolved a Texas lawsuit, the Settlement Agreement was negotiated and executed in New Jersey, performance was not required in Texas, and Grupo was not a party to the Coverage Lawsuit. 2013 WL 1683641 at *7 (citing *Cerbone v. Farb*, 225 S.W.3d 764, 769–71 (Tex. App.—Houston [1st Dist.] 2007, no pet.)).

On remand, additional discovery revealed that (1) Grupo "was a party and/or granted releases and indemnities in five other insurance settlements" in the Coverage Lawsuit, and (2) Grupo directed Asarco to transfer a significant portion of the settlement proceeds from the Coverage Lawsuit to a Grupo-controlled Texas bank account. By its second issue, Grupo contends that there are no new jurisdictional facts showing that Grupo purposefully availed itself of Texas's jurisdiction by entering into the Settlement Agreement.[9] We agree.

---

*Dunlop Tires Operations, S.A., v. Brown*, 564 U.S. 915, 919 (2011); *Perkins v. Benguet Consol. Mining Co., 342 U.S. 437,* 447–48 *(1952).*

[9] Grupo maintains that Asarco's in-house counsel, Kevin McCaffery, did not have authority to execute the Settlement Agreement on Grupo's behalf. The evidence on this issue is conflicting. For purposes of this appeal, we conclude under our deferential standard of review that the evidence is sufficient to support the trial court's implied finding that McCaffrey was authorized to bind Grupo to the agreement. *See Old Republic*, 549 S.W.3d at 558 (Tex. 2018).

14

For the trial court to properly exercise specific jurisdiction in this case, (1) Grupo must have made minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, and (2) Grupo's liability must arise from or be sufficiently related to those contacts. *See Moki Mac*, 221 S.W.3d at 576 (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)). Grupo's alleged liability in this case arises from its obligations, if any, to defend and indemnify Mt. McKinley under the terms of the Settlement Agreement. Mt. McKinley contends that Grupo's contacts with Texas were more significant than previously known because it "was a party and/or granted releases and indemnities" in five other settlements arising out of the Coverage Lawsuit. However, these settlements suffer from the same jurisdictional infirmities as the Settlement Agreement. The record indicates that these agreements were negotiated and executed outside of Texas, including four that contain New York choice-of-law provisions. All of the agreements require the carriers to perform by tendering payments to out-of-state banks or Asarco's asbestos attorneys in New Jersey. Finally, the only performance required in Texas was Asarco's dismissal of its claims in the Coverage Lawsuit, a suit to which Grupo was not a party. None of these agreements, individually or collectively, establish that Grupo itself conducted activities in Texas. *See Cornerstone Healthcare*, 493 S.W.3d at 70 ("[O]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person." (citing *Michiana*, 168 S.W.3d at 785)). Therefore, for the same reasons discussed in *Grupo I*, the link between Grupo, the Settlement Agreement, and Texas is too attenuated to find

15

that Grupo purposefully availed itself of the privilege of conducting activities in Texas. 2013 WL 1683641 at *7 (citing *Cerbone*, 225 S.W.3d at 769–71).

We are also not persuaded that Grupo's directive that Asarco subsequently transfer settlement proceeds to a Grupo-controlled Texas bank account establishes specific jurisdiction. Although this activity constitutes a purposeful contact with Texas, we fail to see how Grupo's potential liability under the Settlement Agreement arises from this after-the-fact contact. *See Moki Mac*, 221 S.W.3d at 576 (citing *Am. Type Culture Collection*, 83 S.W.3d at 806). In other words, there is not a substantial connection between those contacts and the operative facts of this litigation, which principally concern whether Asarco's in-house counsel had authority to execute the Settlement Agreement on Grupo's behalf. *See id.* at 585. Therefore, we conclude this contact was not sufficiently related to Grupo's potential liability in this case. *See id.* (citing *Am. Type Culture Collection*, 83 S.W.3d at 806). Because the trial court does not have specific jurisdiction over Grupo based on Grupo's in-state contacts, we sustain Grupo's second issue.

## C.    Alter Ego: Whether Asarco's In-State Contacts Can Be Imputed to Grupo to Establish Specific Jurisdiction

Mt. McKinley also alleges that Asarco's contacts with Texas—most notably, filing the Coverage Lawsuit in Texas—should be imputed to Grupo under an alter ego theory. By its third issue, Grupo contends that the evidence is legally and factually insufficient to establish an alter ego relationship between Grupo and Asarco. We conclude that (1) the record contains sufficient evidence from which the trial court could infer an alter ego relationship, and (2) the addition of these imputed contacts establishes specific jurisdiction.

16

### 1.    Waiver

As a preliminary matter, we conclude that Mt. McKinley did not waive this basis for personal jurisdiction by only discussing alter ego in the context of general jurisdiction, as Grupo suggests. To the contrary, Mt. McKinley alleges in its pleading that, "[a]t the time the Settlement Agreement was signed, these subsidiary corporations were not operated as separate businesses from Grupo Mexico, but as a single business enterprise, a sham, alter egos, and/or joint ventures, such that their identities should properly be fused in fairness for purposes of assessing *both general and specific jurisdiction*." (Emphasis added). Mt. McKinley goes on to specifically allege that Asarco's "institution, maintenance, settlement, and dismissal of the [Coverage] Lawsuit" should be imputed to Grupo. More pointedly, Mt. McKinley alleges that "[Grupo] itself or through its *alter ego* [Asarco] caused the [Coverage Lawsuit] to be instituted against Mt. McKinley and other insurers, directed its settlement, and caused the Settlement Agreement to be signed which required performance in Texas." The Settlement Agreement gave rise to Mt. McKinley's claims in this suit; therefore, these allegations can only be properly characterized as supporting specific jurisdiction, *see Cornerstone Healthcare*, 493 S.W.3d at 71, not whether Grupo's activities were otherwise so pervasive and constant "as to render [Grupo] essentially at home in [Texas]." *See Goodyear*, 564 U.S. at 919. Thus, this basis for specific jurisdiction was squarely before the trial court.

### 2.    Jurisdictional Veil-Piercing

When a parent corporation dominates and controls a subsidiary to the extent that the subsidiary ceases to operate as a distinct and separate corporate entity, a court may

17

attribute the subsidiary's in-state contacts to the parent for jurisdictional purposes. *PHC-Minden*, 235 S.W.3d at 173 (citing *BMC Software*, 83 S.W.3d at 798). Because Texas law presumes that two separate corporations are distinct entities, the party seeking to attribute one corporation's actions to another bears the burden of proving otherwise. *Id.* (citing *BMC Software*, 83 S.W.3d at 798).

Jurisdictional and substantive veil-piercing are distinct concepts with different elements of proof. *Id.* at 174 (explaining that "personal jurisdiction involves due process concerns that cannot be overridden by statutes or common law." (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667–68 (6th Cir. 2005))). For example, although fraud is necessary to pierce the corporate veil under § 21.223 of the Texas Business Organizations Code, it "has no place in assessing contacts to determine jurisdiction." *Id.* at 175 (citing TEX. BUS. ORGS. CODE ANN. § 21.223). Similarly, undercapitalization has been cited by the Texas Supreme Court as a distinct basis for substantive veil-piercing, *Castleberry v. Branscum*, 721 S.W.2d 270, 272 n.3 (Tex. 1986) (citation omitted), that should be disregarded in a jurisdictional analysis. *See PHC-Minden*, 235 S.W.3d at 174 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 425 (9th Cir. 1977)).

Instead, the plaintiff must prove that the parent exercises control over the subsidiary's internal business operations and affairs beyond normal parental involvement. *PHC-Minden*, 235 S.W.3d at 175 (citing *BMC Software*, 83 S.W.3d at 799). "Appropriate, parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies." *Id.*

18

at 176 (quoting 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 108.42[3][b] (3d ed. 2007). There must be a "plus" factor, "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.* (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)). The parent should "not be involved in its subsidiary's day-to-day operations." *Zamarron v. Shinko Wire Co.*, 125 S.W.3d 132, 142 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Dunn v. A/S Em. Z. Svitzer*, 885 F. Supp. 980, 988 (S.D. Tex. 1995)).

A court should also consider the amount of the subsidiary's stock owned by the parent, the existence of separate headquarters, and the observance of corporate formalities. *PHC-Minden*, 235 S.W.3d at 175 (citing 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4 (2007)). However, stock ownership or a duplication of some or all of the directors or officers, without more, does not prove the existence of a corporate fiction. *Id.* (citing *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975)).

### 3. Disregarded Evidence

We now turn to the record in this case to determine if there is sufficient evidence to overcome the presumption under Texas law that Grupo and Asarco are separate corporate entities. *See PHC-Minden*, 235 S.W.3d at 173 (citing *BMC Software*, 83 S.W.3d at 798).

The extensive record in this case establishes that Grupo structured the SPCC Transfer in a manner that benefited Grupo and left Asarco undercapitalized, a significant factor in substantive, but not jurisdictional, veil-piercing. *See PHC–Minden*, 235 S.W.3d

19

at 174 (citing *Wells Fargo Express Co.*, 556 F.2d at 425); *see also Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 206 (5th Cir. 1995) (collecting cases recognizing that undercapitalization is a significant factor in determining substantive veil-piercing.). Prior to *PHC–Minden*, our Court and others considered a list of factors when determining jurisdictional veil-piercing, including undercapitalization and whether each entity was free to act in its own best interest. *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.*, 82 S.W.3d 622, 634–35 (Tex. App.—Corpus Christi–Edinburg 2002, pet. dism'd w.o.j.); *Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 721 (Tex. App.—Austin 2000, pet. dism'd w.o.j.); *Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 419 (Tex. App.—Houston [14th Dist.] 1997, no writ). The record supports an implied finding of alter ego under these two factors, but they are no longer relevant to our jurisdictional inquiry. *See PHC–Minden*, 235 S.W.3d at 174–75 (discussing the relevant factors). Similarly, although Judge Hanen found that the SPCC Transfer constituted an actual fraudulent conveyance, *see Asarco, LLC*, 396 B.R. at 394, fraud "has no place in assessing contacts to determine jurisdiction." *See PHC–Minden*, 235 S.W.3d 175 (citing TEX. BUS. ORGS. CODE ANN. § 21.223). Therefore, Mt. McKinley's reliance on this evidence is misplaced.

### 4. Evidence of Alter Ego

Instead, we look to the four factors outlined in *PHC–Minden*: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. 235 S.W.3d

at 175 (citing 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4). As we noted in *Grupo I*, it is undisputed that Grupo indirectly owns 100% of Asarco's stock, but it is also undisputed that Asarco and Grupo maintain separate headquarters. 2013 WL 1683641, at *5. "Accordingly, application of the first two factors enumerated in *PHC–Minden* does not resolve the jurisdictional question." *Id.*

It is also undisputed that Grupo exercised a degree of control over Asarco. The heart of the inquiry, really, is whether Grupo's control over Asarco extended to Asarco's internal business operations and affairs. *See PHC–Minden*, 235 S.W.3d at 175 (citing *BMC Software*, 83 S.W.3d at 799); *Hargrave*, 710 F.2d at 1160. We conclude that the record is sufficient to support the trial court's implied finding that Grupo's control over Asarco was "atypical" or "abnormal." *See PHC–Minden*, 235 S.W.3d at 176; *BMC Software*, 83 S.W.3d at 800.

After acquiring Asarco, Grupo replaced Asarco's directors and officers with Grupo directors and officers. This fact alone is insufficient to establish an alter ego relationship. *See PHC–Minden*, 235 S.W.3d at 175 (citing *Gentry*, 528 S.W.2d at 573). However, from the time the Coverage Lawsuit was filed through the execution of the Settlement Agreement, Daniel Tellechea served as the CFO for Grupo, AMC, and Asarco, yet he did not "charge ASARCO or [the] other subsidiaries one penny" for his services. His salary was paid exclusively by another Grupo company created to provide financial and other services to Grupo subsidiaries. And despite his various titles, Tellechea considered himself "an employee of Grupo" that reported to German Larrea, Grupo's chairman and CEO.

21

According to Asarco's general counsel, Douglas McAllister, German ran Asarco like a sole proprietorship. In that regard, he testified that Grupo exercised "[p]ervasive, total control" over Asarco's affairs. As a specific example, McAllister recalled that Tellechea, who had become Asarco's president at the time, wanted to increase the salaries of Asarco's employees at the end of the year, but could not do so without getting German's approval. Instead of salary increases, German authorized a $25 Wal-Mart gift card as a Christmas bonus for each salaried employee. McAllister further testified:

> We—we didn't have a board of directors that acted as a—what I thought a normal company board of directors would act like. They never met. Everything was handled through unanimous consent usually after the fact. There was no independent decision-making authority in the Asarco board of directors. There was no independent decision-making authority in the management team of Asarco. It was going to German and getting authority to do what we wanted to do and needed to do.

Kevin McCaffrey, Asarco's in-house counsel who executed the Settlement Agreement, testified that "after the Grupo acquisition, there was no decision, whether it was paper clips or a $100 million insurance settlement, that wasn't presented to German Larrea." McCaffrey also testified that "Grupo had complete control of what Asarco was doing."

Leading up to the SPCC Transfer, corporate counsel suggested Asarco form a three-person restructuring committee and include two independent directors from the local business community. One of those independent directors, John Patton, testified that Asarco's then-president, Genaro Larrea,[10] "operated under very strict control from

---

[10] Genaro Larrea was German's brother. In addition to serving as Asarco's president from the time the Coverage Lawsuit was filed through the execution of the Settlement Agreement, he also served on the board of directors for both AMC and Grupo and as vice president and CCO for AMC.

Mexico City." Patton added, "it was clear that he was the sock puppet for Mexico City, in that his lips moved[,] and their voice was heard."

Although Asarco was suffering a "liquidity crisis," unable to pay vendors critical to its daily operations, Grupo directed Asarco to place the proceeds from the Settlement Agreement and all of the other buy-back agreements into a specific bank account (the "GBM Account") and forbade Asarco's use of its *own* funds without Grupo's approval. Although the GBM Account was opened in Asarco's name, the "Home Address" provided was Grupo's corporate office in Mexico City. Moreover, Asarco executed a power of attorney that granted Grupo officers and directors control over all of Asarco's "checking accounts with any bank or financial institution . . . wherever situated." In practice, Grupo exercised absolute control over Asarco's operating capital. For example, George Burns, Asarco's vice president of operations, needed Grupo's permission to use funds in the GBM Account to purchase fuel, an everyday operating expense.

We conclude the record supports the trial court's implied findings that Grupo disregarded corporate formalities and exercised a degree of control over Asarco that went beyond normal parental involvement. *See PHC-Minden*, 235 S.W.3d at 175; *BMC Software*, 83 S.W.3d at 799. In light of "[a]ll the relevant facts and circumstances surrounding the operations of the parent and subsidiary," *see Hargrave*, 710 F.2d at 1160, the evidence is legally and factually sufficient to impute Asarco's in-state contacts to Grupo.

**5.    Purposeful Availment**

Importantly, Grupo has never suggested that the trial court would not have specific jurisdiction over Asarco if it were a party to this suit, only that Asarco's contacts should not be imputed to Grupo for jurisdictional purposes. In other words, Grupo does not dispute that Asarco's contacts, if imputed to Grupo, would be sufficient to establish that Grupo had minimum contacts with Texas for purposes of specific jurisdiction. Nevertheless, having imputed Asarco's contacts to Grupo, we conclude that Grupo purposefully availed itself of Texas's jurisdiction.

Grupo's choice to file the Coverage Lawsuit in Nueces County, Texas was not a "random, isolated, or fortuitous" act. *See Michiana*, 168 S.W.3d at 785. Neither Asarco nor Mt. McKinley were Texas residents, and it is unclear which, if any, of the other carriers were Texas residents. It is reasonable to infer that Grupo perceived some strategic benefit by filing the Coverage Lawsuit in Nueces County, Texas. Regardless, Grupo sought the benefit and advantage of Texas's legal system to enforce Asarco's rights under the insurance policies, resulting in a $12 million settlement with Mt. McKinley, as well as five additional settlements with other carriers worth tens of millions of dollars more. *See Michiana*, 168 S.W.3d at 785. Grupo's choice to monetize these assets was an instrumental part of its plan to execute the SPCC Transfer, a transaction that was designed to ultimately benefit Grupo.[11] Additionally, by entering into the Settlement Agreement, it was foreseeable that a dispute concerning that agreement may arise. *See BMC Software*, 83 S.W.3d at 795 (explaining that although not determinative,

---

[11] McCaffrey, Asarco's in-house counsel, testified that Grupo directed Asarco to monetize its insurance policies.

24

foreseeability of causing injury is "an important consideration" in deciding whether a nonresident defendant has purposefully established minimum contacts). Finally, filing the Coverage Lawsuit in Texas gave rise to Grupo's potential liability under the Settlement Agreement; i.e., there is a substantial connection between Grupo's imputed contacts and the operative facts in this case. *See Moki Mac*, 221 S.W.3d at 576 (citing *Am. Type Culture Collection*, 83 S.W.3d at 806). Unlike Grupo's own contacts with Texas, we conclude that the addition of Asarco's imputed contacts are sufficient to confer the trial court with specific jurisdiction over Grupo.

**D.     Notions of Fair Play and Substantial Justice**

In addition to minimum contacts, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *PHC-Minden*, 235 S.W.3d at 166 (citing *Int'l Shoe*, 326 U.S. at 316). These considerations are typically satisfied once minimum contacts have been established. *Spir Star*, 310 S.W.3d at 878 (citing *Guardian Royal*, 815 S.W.2d at 231). It is the defendant's burden to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable," including (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the international judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Id.* at 878–79 (quoting *Guardian Royal*, 815 S.W.2d at 231).

In this case, Grupo focused exclusively on disputing its minimum contacts. Because Grupo failed to present "a compelling case that the presence of some

consideration would render jurisdiction unreasonable," we conclude that exercising jurisdiction over Grupo would comport with traditional notions of fair play and substantial justice. *See id.* at 878 (citing *Guardian Royal*, 815 S.W.2d at 231); *PHC-Minden*, 235 S.W.3d at 166 (citing *Int'l Shoe*, 326 U.S. at 316). Therefore, we overrule Grupo's third issue and affirm the trial court's denial of Grupo's special appearance.

## E.      Motion to Strike

Mt. McKinley filed a motion to strike Grupo's special appearance as a sanction for alleged discovery abuses. By its fourth issue, Grupo contends that the trial court implicitly denied the motion but, out of an abundance of caution, challenges any such sanction as excessive. *See* Tex. R. Civ. P. 215.2(b) (requiring that discovery sanctions be "just"). In response, Mt. McKinley concedes that the trial court implicitly denied its motion to strike but asserts the merits of its motion as an alternative basis for denying Grupo's special appearance. Mt. McKinley was not required to cross-appeal this alternative ground for denying Grupo's special appearance. *See* Tex. R. App. P. 25.1(c) (only the "party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal"); *Cardwell v. Whataburger Rests. LLC*, 484 S.W.3d 426, 428 (Tex. 2016) (per curium). However, having already affirmed the trial court's order denying Grupo's special appearance, we decline to address this issue. *See* Tex. R. App. P. 47.1. ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## IV. CONCLUSION

We agree with Grupo that Mt. McKinley failed to establish the trial court's general jurisdiction over Grupo or that Grupo's own contacts were sufficient to confer the trial court with specific jurisdiction. We disagree, however, that Mt. McKinley cannot impute Asarco's Texas contacts to Grupo under an alter ego theory. These imputed contacts establish the minimum contacts necessary for the trial court to exercise specific jurisdiction over Grupo. Accordingly, the trial court's order denying Grupo's special appearance is affirmed.

GREGORY T. PERKES
Justice

Delivered and filed the
30th day of January, 2020.